J-A06018-24

2024 PA Super 110

| | | |
|---|---|---|
| JUSTIN HUNT | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH VARDARO | : | No. 976 WDA 2023 |

Appeal from the Order Entered August 15, 2023
In the Court of Common Pleas of Crawford County
Civil Division at No(s): F.D. 2023-142

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

OPINION BY PANELLA, P.J.E.: **FILED: May 30, 2024**

Justin Hunt ("Appellant") appeals from the August 15, 2023 order that sustained the preliminary objections filed by Joseph Vardaro ("Father") and dismissed Appellant's custody complaint for lack of standing with respect to the male child, S.R.C. ("Child"), born in August 2010. We affirm.

On May 16, 2023, Appellant filed a custody complaint seeking primary physical custody of Child pursuant to 23 Pa.C.S.A. § 5324(2) ("A person who stands *in loco parentis* to the child"). Appellant alleged that he is Child's stepfather, and that he resided with Child "from approximately 8 months of age in 2011 through April 2019." Complaint, 5/16/23, at ¶ 6; *see id.* at 1, 4. In addition, Appellant alleged that Child's mother, Catherine Hunt ("Mother"), died on September 5, 2020, and that Father is Child's natural father. *See id.* at ¶¶ 2-3.

On June 5, 2023, Father filed preliminary objections to the custody complaint wherein he asserted that Appellant does not stand *in loco parentis* to Child and requested that the complaint be dismissed. Specifically, Father alleged that, on April 13, 2019, following Appellant and Mother's arrest, Crawford County Children and Youth ("CYS") removed Child and his younger half-brother[1] from Appellant and Mother's care. ***See*** Preliminary Objections, 6/5/23, at ¶ 11. Father alleged that CYS filed a dependency petition, and following a hearing on June 20, 2019, the court found that Child was not a dependent child, dismissed the dependency petition, and placed Child in Father's legal and physical custody. ***See id.*** at ¶ 13, Exhibit B. Father alleged that, "for approximately five years[, Appellant] has not exercised any custodial privileges or time with [] Child unless permitted by [] Father." ***Id.*** at ¶ 30.

On August 14, 2023, the trial court held an evidentiary hearing on Father's preliminary objections. Father testified on his own behalf, and he presented the testimony of his long-term paramour, Tasha Southworth, with whom he shares six children. Appellant testified on his own behalf, and he presented the testimony of Child's maternal uncle, John Campbell.

The court made the following factual findings, which the testimonial evidence supports.

> [C]hild was born to [Mother] and [Father]. Child lived with his mother, as [Father] and Mother were not an intact couple.

---

[1] Appellant and Mother are the biological parents of Child's younger half-brother.

Mother and [C]hild moved in with [Appellant] in September of 2011. Sometimes Mother lived with [Appellant] and sometimes she did not. Mother would move around and her relationships with both [Appellant] and [Father] were never stable.

During the time [Appellant] lived with [C]hild, [Appellant] acted like an involved stepparent. [Appellant] did activities with [C]hild including going outside, fishing, and swimming.[Appellant] also potty-trained [C]hild and paid for things that [C]hild needed.

Because Mother and [Appellant] were "off and on[,]" there were times when [C]hild and Mother lived alone and there were times that they lived with [Appellant]. At some point, [Appellant] and Mother married but there was no testimony as to the date of the marriage.

Sometime in 2017, Mother and [Appellant] split-up. But because there were periods of time when Mother was essentially homeless, [C]hild and Mother would stay with [Appellant] when they had no other place to stay.

In April of 2019, for unspecified reasons, CYS became involved. [Appellant] was incarcerated on July 9, 2019. On June 20, 2019, after an adjudication hearing, the court found that [C]hild was not dependent. As the biological father, [Father] was awarded legal and physical custody of [C]hild. The details are not entirely clear from the testimony, but Mother was apparently awarded some form of visitation. At some point, Mother dropped out of the picture entirely and the visits ended. [Appellant] got out of jail in March of 2020 and had some contact with [C]hild after he was released from jail. Mother passed away in September of 2020. In our view, the most salient fact is that [C]hild has not lived with [Appellant] since 2019.

Trial Court Opinion, 10/24/23, at 3-4; *see also* N.T., 8/14/23, at 13-14, 18, 20-23, 25-26, 31, 38, 49-50, 59, 61, 79.

By order dated August 14, 2023, and entered on August 15, 2023, the trial court sustained Father's preliminary objections and dismissed the custody complaint. Appellant filed a notice of appeal on August 24, 2023.[2]

On appeal, Appellant presents the following two issues for review, which we have re-ordered:

> A.   Whether the [t]rial [c]ourt erred in sustaining [Father]'s [p]reliminary [o]bjections?
>
> B.   Whether the [t]rial [c]ourt erred when it determined that []Appellant lacks *in loco parentis* standing to pursue custody?

Appellant's Brief at 5 (suggested answers omitted).

As a preliminary matter, we observe general principles applicable to standing in child custody matters:

> The fundamental concept of standing ensures that a party seeking to litigate a matter has a substantial, direct, and immediate interest in the subject-matter of the litigation. In the area of child custody, principles of standing have been applied with particular scrupulousness[.] This stringent application of standing principles serves to protect both the interest of the court system by ensuring that actions are litigated by appropriate parties and the interest in keeping a family unit free from intrusion by those that are merely strangers, however well-meaning. … "The liberty interest ... of parents in the care, custody and control of their children-is perhaps the oldest fundamental liberty interest recognized by this Court." ***Troxel v. Granville***, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). … Determining standing in custody

---

[2] Appellant failed to file a concise statement of errors complained of on appeal concurrently with his notice of appeal in violation of Pa.R.A.P. 1925(a)(2)(i) and (b). On August 29, 2023, the trial court entered an order directing Appellant to file a concise statement within twenty-one days, and he timely complied. Because Father does not claim prejudice as a result of Appellant's procedural violation, we do not quash or dismiss his appeal. ***See In re K.T.E.L.***, 983 A.2d 745, 748 (Pa. Super. 2009).

disputes is a threshold issue that must be resolved before proceeding to the merits of the underlying custody action. It is a conceptually distinct legal question which has no bearing on the central issue within the custody action-who is entitled to physical and legal custody of a child in light of his or her best interests. Issues of standing are questions of law; thus, the standard of review is de novo and the scope of review is plenary.

*C.G. v. J.H.*, 193 A.3d 891, 898 (Pa. 2018) (most quotation marks and internal citations omitted). "[O]ur plenary scope of review is of the broadest type; that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact[] and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported." *In the Interest of K.N.L.*, 284 A.3d 121, 132-33 (Pa. 2022) (inner quotation marks and citation omitted).

In determining preliminary objections as to standing that turn on questions of fact, a trial court must hear testimony and admit other evidence into the record. *See C.G. v. J.H.*, 172 A.3d 43, 54 (Pa. Super. 2017), *affirmed*, 193 A.3d 891 (Pa. 2018). We have explained that, when "a trial court holds such an evidentiary hearing, it must weigh the evidence and make credibility determinations to resolve any conflicts in the testimony." *Id.* (citation omitted).

> The United States Supreme Court observed that the liberty interest . . . of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." [*Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality)]. Further, the Court has "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66. Thus, "so long as a parent adequately cares

- 5 -

for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69.

*M.W. v. S.T.*, 196 A.3d 1065, 1072 (Pa. Super. 2018).

As such, the Pennsylvania Child Custody Act ("Act"), 23 Pa.C.SA. §§ 5301, *et seq.*, "[g]enerally does not permit third parties to seek custody of a child contrary to the wishes of that child's parents. The Act provides several exceptions to this rule[.]" *Id.* at 1069 (internal quotation marks and citation omitted). Furthermore, "custody cases may be fluid under some circumstances." *M.W. v. S.T.*, 196 A.3d 1065, 1071 (Pa. Super. 2018) (citation omitted) (concluding that, in determining standing pursuant to Section 5324, the trial court did not err in considering the circumstances as they were at the time the parents filed the petition to dismiss the grandmother's custody complaint, *i.e.*, the children's dependency adjudication was discharged).

At issue in this case is Section 5324(2) of the Act, which provides that an individual person who stands *in loco parentis* to a child "may file an action … for any form of physical custody or legal custody[.]" 23 Pa.C.S.A. § 5324(2).

It is well-established that:

> [T]he term *in loco parentis* literally means in the place of a parent. A person stands *in loco parentis* with respect to a child when he or she assumes the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge

- 6 -

of parental duties. Critical to our discussion here, *in loco parentis* status cannot be achieved without the consent and knowledge of, and in disregard of, the wishes of a parent.

***K.W. v. S.L.***, 157 A.3d 498, 504–05 (Pa. Super. 2017) (quotation marks and internal citations omitted).

Turning to the instant matter, in sustaining Father's preliminary objections and dismissing Appellant's complaint, the trial court found "the most salient fact is that [C]hild has not lived with [Appellant] since 2019." Trial Court Opinion, 10/24/23, at 4. The court reasoned:

> [Appellant] has not played a prominent role in [C]hild's life for four years and [C]hild has not lived with him for four years. In the past four years, he has not assumed parental duties or discharged such duties. If [Appellant] filed a custody complaint shortly after [C]hild no longer lived with him, our decision may be different. There was also no evidence presented that [Father] ever acquiesced to [Appellant] standing *in loco parentis* to [Father]'s child.

> The plain language of the statute reads "A person who **stands** (emphasis added) *in loco parentis* [to] the child." 23 Pa.C.S.A. § 5324. "Stands" is the present tense of the verb "stand." Generally, a statute's plain language provides the best indication of legislative intent. We will only look beyond the plain language of the statute when words are unclear or ambiguous, or the plain meaning would lead to "a result that is absurd, or unreasonable." 1 Pa.C.S.A. § 1922(1). Therefore, when ascertaining the meaning of the statute, if the language is clear, we give the words they are plain and ordinary meaning. [***Ruhlman v.***] ***Ruhlman***, 291 A.3d 916, 921 ([Pa. Super.] 2023).

> It is hard to fathom how [Appellant] can assert standing as "a person who stands *in loco parentis* to the child" when he has had very little contact with [C]hild and has not lived with [C]hild for four years.

> If the legislature intended for persons to be able to assert standing when they have not exercised parental duties and

> obligations for such a lengthy period of time, the legislature could have simply stated "A person who stands or has stood *in loco parentis* to the child." Based on the statute as written, [Appellant] had to establish a timelier connection to his relationship with [C]hild and the filing of the custody complaint. Accordingly, Appellant lacked standing to pursue custody of Child.

*Id.* at 4-5.

Appellant argues in his first issue that the court erred in concluding that he lost *in loco parentis* status due to "the gap in time" from when he stopped living with Child in April of 2019, until May of 2023, when he initiated the custody action. Appellant's Brief at 22. Appellant relies on **Liebner v. Simcox**, 834 A.2d 606 (Pa. Super. 2003), and asserts that this Court has "rejected the argument that *in loco parentis* status can be lost by a change in circumstances." *Id.* at 20. In addition, Appellant relies on **In re Adoption of A.M.W.**, 289 A.3d 109 (Pa. Super. 2023) (*en banc*), and asserts that there is no requirement that *in loco parentis* status "must be current" to establish standing. *Id.* Both **Liebner** and **A.M.W.** are readily distinguishable.

In **Liebner**, the child's mother challenged the trial court's finding that her former husband/child's stepfather stood *in loco parentis* and had standing to seek partial physical custody. The mother argued that her former husband lost *in loco parentis* status once they separated, and she remarried. We rejected the mother's argument insofar as her former husband "maintained regular contact" with the child for three years after the parties' separation pursuant to a custody arrangement where he exercised physical custody of the child whenever he had custody of his biological daughter, the child's half-

sister, which was generally on alternating weekends and on some holidays and vacations. Further, when the mother abruptly ended her former husband's custody of the child, he filed a custody complaint two days later.

In contrast, in this case, the parties did not agree to a custody arrangement after Child was placed in Father's legal and physical custody in June of 2019. Rather, the record establishes that Father permitted Child to visit Appellant on several occasions. There is no dispute that Child was removed from Appellant and Mother in April of 2019, upon their arrest. *See* N.T., 8/14/23, at 60. Appellant confirmed on cross-examination that Father let him "from time to time have visits" with Child after his release from prison, which was in March of 2020. *Id.* at 61, 79. Appellant testified that "it was pretty regular that I was getting him like every other weekend." *Id.* at 62.

However, Father testified that he allowed Child to "go to [Appellant's] house three or four times so he could see his [half-]brother."[3] *Id.* at 22. Father explained that, approximately "eight months to a year" after Appellant was released from prison, he permitted Child as well as his children born from his relationship with Ms. Southworth to go to Appellant's house, and that they went "probably like once a month for a few times. . . . I did stop it for about a year, and I let him go one more time and [they] came back with the same stuff so I stopped it completely." *Id.* at 22, 33-34. Specifically, Father testified

_____

[3] It is undisputed that Mother gave birth to Appellant's son, who is Child's younger half-brother.

on direct examination that he no longer allowed Child to visit Appellant for the following reason.

> A. I let all the kids go to his house three or four times so [Child] could see his [half-]brother . . ., and [the kids] were complaining, they were smelling like weed. They were complaining [Appellant and his paramour] were smoking marijuana in front of the kids, and [Child] was getting upset when he came back, like hit his brothers. . . .
>
> Q. Did you have a conversation with [Appellant] about that?
>
> A. Yeah, I told him that the kids were smelling like weed and we didn't want them around that, and I also asked him not to place pictures of my children on social media, and he kept doing that, so I had no other option than to stop them from going there.

*Id.* at 22-23. Father confirmed that it was more than a year ago that he stopped Child's visits with Appellant, but that he told Appellant he could bring Child's half-brother "to the house anytime. . . ." *Id.* at 23, 34. Father testified that Appellant "did drop [Child's half-brother] off once." *Id.* at 23-24. Based on the foregoing, we conclude that *Liebner* is distinguishable and, therefore, not controlling.

With respect to *A.M.W.*, *supra*, Appellant's reliance is misplaced. In that case, this Court vacated the decree dismissing the former stepfather's adoption petition for lack of standing to intervene and granting the current stepfather's petition to adopt, and remanded for the court, in part, to reconsider the former stepfather's standing. Contrary to the instant matter, the former stepfather in that case exercised shared legal and physical custody of the child after he separated from the mother pursuant to a post-nuptial

agreement between the parties. In any event, the former stepfather's *in loco parentis* status was not in dispute. Rather, in finding that the former stepfather lacked standing to intervene in the adoption action in that case, the trial court instead focused on the absence of the mother's consent under Section 2711 of the Adoption Act, which we concluded was an error of law. *See A.M.W.*, 289 A.3d at 117. In so holding, this Court concluded that our Supreme Court's decision in *In the Interest of K.N.L.*, *supra*, was controlling, wherein the Court "rejected the juvenile court's conclusion that the [former caregiver's] current *in loco parentis* status and [the child welfare agency's] consent was necessary to establish [former caregiver's] standing" to intervene in the adoption proceeding. *A.M.W.*, 289 A.3d at 116.

We deem *A.M.W.* inapplicable to the instant matter which does not involve a petition under the Adoption Act. Even if *A.M.W.* were not distinguishable on that basis, we would still conclude that it is inapplicable to this case where no custody arrangement existed between the parties once Father was awarded legal and physical custody of Child in June of 2019.

We have carefully considered the sustainable findings of fact of the trial court and given due deference to its determinations regarding credibility and weight of the evidence. In sum, those findings demonstrate that Child has not resided with Appellant since April of 2019, the same month that Appellant became incarcerated. Father was awarded legal and physical custody of Child in June of 2019, and it is unclear from the record whether Mother exercised

any custody prior to her death in September of 2020. Appellant was released from prison in March of 2020, and, approximately eight months to one year later, after Mother's death, Father permitted Child and his other children to visit Appellant and Child's half-brother three or four times. Based on these facts, and given Father's fundamental liberty interests in the care, custody, and control of Child, as well as the fluid nature of custody cases, we conclude that Appellant does not have an immediate interest in Child's custody, and, thus, is not an aggrieved party. Therefore, the trial court did not err or abuse its discretion in sustaining Father's preliminary objections and dismissing Appellant's custody complaint.

Based on this disposition, Appellant's second issue, that he stood *in loco parentis* to Child when he lived with him, is moot. Therefore, we need not address it. Accordingly, we affirm the order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

**5/30/2024**

- 12 -