J-S40016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| BRYSON R. MILLS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KIERSTEN P. YEAGER | : | |
| | : | |
| | : | No. 1046 MDA 2025 |
| v. | : | |
| | : | |
| | : | |
| DAKOTA PETERS | : | |
| | : | |
| Appellant | : | |

Appeal from the Order Entered June 30, 2025
In the Court of Common Pleas of Franklin County
Civil Division at No(s): 2023-3439

| | | |
|---|---|---|
| BRYSON R. MILLS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KIERSTEN P. YEAGER | : | |
| | : | |
| | : | No. 1169 MDA 2025 |
| v. | : | |
| | : | |
| | : | |
| DAKOTA PETERS | : | |
| | : | |
| Appellant | : | |

Appeal from the Order Entered July 23, 2025
In the Court of Common Pleas of Franklin County
Civil Division at No(s): 2023-3439


BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY PANELLA, P.J.E.:                    **FILED JANUARY 08, 2026**

In these consolidated cases,[1] Dakota Peters ("Father") appeals from the orders entered in the Franklin County Court of Common Pleas on June 30, 2025 and July 23, 2025, granting standing to Plaintiff, Bryson R. Mills, and granting Mills partial physical custody to H.T.A.M., d.o.b. May 2022 ("Child").[2] After our thorough review, we reverse.

We glean the following procedural history and factual background from our review of the record. Mother told Mills in September 2021 that she was pregnant with Child and that he was the biological father. Mills resides in Texas and the two had briefly dated and were not in a romantic relationship at the time. Mills was present for Child's birth in May 2022, and is the named father on Child's birth certificate.

Mother and Child resided in Texas with Mills, a member of the National Guard, until he was deployed in July 2022. In December 2022, Mother ended her relationship with Mills and, in January 2023, while Mills still was deployed, Mother and Child relocated to Pennsylvania. Mills returned from deployment in late March 2023, lived in a Pennsylvania Airbnb for approximately two months, and then returned to Texas in June 2023.

---

[1] This Court consolidated, *sua sponte*, Father's appeals from the June 20, 2025 standing order and July 23, 2025 custody order on September 26, 2025.

[2] Amber Chase, Esquire, appeared at the hearing of this matter as guardian ad litem ("GAL") for Child. She supports Father's position.

Mills remained in contact with Mother and infant Child throughout this time and, in October 2023, after Mills filed a custody action, the court granted Mills one week of visitation with Child the first week of each month, as well as telephone/video calls.

Mills exercised about six or seven one-week periods of custody over approximately 10 months, between November 2023 until September 2024, when Mother initiated an action against him for child support. In response, Mills requested genetic testing that determined he was not the biological father of Child, and Mother's child support complaint was dismissed.

In the meantime, in July 2024, Mother contacted Father and, for the first time, told him he was possibly Child's biological father. Father obtained a paternity test in August 2024, which confirmed he is Child's biological father. Mother initiated a support action against Father in September 2024.

On October 16, 2024, Mother filed a Petition for Special Relief, requesting that the court stay Child's periods of physical custody with Mills as a result of the genetic testing results. On October 24, 2024, the court stayed Mills's weekly custody with Child.

On November 25, 2024, Father filed a petition to intervene and a custody complaint. The court granted Father's petition to intervene. After a January 14, 2025, conference with all counsel, Mills filed a Petition to Vacate Stay of Proceedings in which he asserted standing pursuant to 23 Pa.C.S.A. § 5324(2), *in loco parentis*. The court scheduled a hearing for March 4, 2025,

at which time Child was approximately 34 months' old. *See* N.T. Hearing, 3/4/25, at 40.

Mills, Father, and Mother were each represented by counsel at the hearing and testified about their respective positions.

Mills testified he resides 21 hours away from Child in Texas, where he is a member of the national guard and a federal technician maintaining Black Hawk Helicopters. *See id.* at 5, 26. Mills dated Mother in 2021, but they were not in a relationship in September 2021 when he learned she was pregnant. *See id.* at 27. Mills was identified as the biological father on Child's birth certificate and Mills was present for Child's birth. *See id.* at 11. Mills, Mother, and Child lived together in Texas for approximately one month until Mills was deployed on June 9, 2022. *See id.* at 6-7. Mills testified that, during that period and throughout his deployment, he provided Mother and Child with health insurance, monetary support, and use of his car. *See id.* at 8, 40-41, 46. Mills stated he called and FaceTimed Mother and Child daily while he was deployed, and infant Child seemed excited to see him. In December 2022, Mills and Mother ended their romantic relationship. *Id.* at 7, 28. However, from November 2022 to January 2023, Mother and Child lived with Mills' parents in Florida. *See id.* at 9. Mother and Child moved to Pennsylvania in January 2023. *See id.* at 28.

Mills returned from his deployment at the end of March 2023 when Child was approximately ten months old and Mills temporarily moved to a Pennsylvania Airbnb for two months, until the beginning of June 2023. *See*

*id.* at 10, 30, 40. Mills testified that, during that brief time, he would visit with Child when Mother consented, and Child would call him "Dad." ***See id.*** at 10-12. After Mills returned to Texas in June 2023, Child had a two-week visit with him in July 2023. ***See id.*** at 12, 26, 32. Mills and Child spent time with Mills' family, whom Mills testified Child was excited to see. ***See id.*** at 13. Because Mills lived 21 hours from Child and Mother, he admitted he had not been involved in Child's doctor's appointments or normal daily routine since Child was a month or two old. ***See id.***

After July 2023, Mills next saw Child in-person three months later at a court hearing in October 2023 held on Mills' custody action. ***See id.*** at 33. The court's resulting November 9, 2023 custody order granted Mills the ability to call Child and to have one week of physical custody per month. ***See id.*** at 34. Mills only had custody of Child for seven or eight non-sequential weeks between November 2023 and September 2024. Daily phone and video calls continued. ***See id.*** at 50-51.

In September 2024, Mother filed a child support action against Mills. In response, Mills requested paternity testing, despite testifying he had never doubted he was Child's biological father, and that whether or not he was Child's biological father did not affect his interest in being a father to Child. ***See id.*** at 18-19. In October 2024, the court ended Mills' physical custody of Child due to the paternity test results. Since then Mills has had daily video calls with Child. ***See id.*** at 13-14.

When asked what parental duties he has performed, Mills testified that, during periods of physical custody, he would bring Child to Texas, where he would tend to Child's daily needs, take him to visit extended family, and transport him to and from daycare. *See id.* at 19, 33, 35. Mills testified he had provided health coverage for Child while deployed and, as of the date of the hearing, he was still providing health insurance coverage for him through his federal employment. *See id.* at 14, 35, 36. Child is listed as Mills' dependent for Mills' military benefits, and Mills has approximately $20,000 in life insurance for Child. *See id.* at 14-15. Despite the fact that Child has always primarily lived with Mother, Mills claimed Child on his tax return in 2023 and received a $2,200 tax credit, which Mills place in a high yield savings account for Child instead of giving it to Mother for Child's care. *See id.* at 36-37.

According to Mills, he gave Mother three or four thousand dollars during the period he was in Pennsylvania in 2023 after his deployment. *See id.* at 19, 38. He also gave her money toward the purchase of a vehicle, since she had sold her car at his suggestion. *See id.* at 38. He explained that, during his deployment he would transfer money to Mother on a Navy Federal card that he had access to so he could monitor how Mother was spending the money and ensure it was spent "[t]he way it should have been spent" and that "it was all going to the right places" for Child, as it had come to his attention that she was spending money to visit another man in Georgia. *Id.* at 45.

In approximately August 2023, when Child was sixteen months old, Mills stopped giving Mother any money to support Child because she told him he could not see Child. *See id.* at 41-42. Mills admitted that, from when Child was sixteen months old until the March 2025 hearing when Child was thirty-four months old, he had not provided any monetary support to Mother for Child. *See id.* at 42, 48. He stated that Mother did not ask him for money, although she complained that he did not send any to her. *See id.* at 48. He testified that, although he earned approximately $76,000 per year, he did not give Mother any money toward the support of Child because he did not have the ability to do so. *See id.* at 38-39. When asked why he did not want a child support order against him, Mills said he did not want any unnecessary money going to the court, although he did not know whether the court actually would take any money from his child support payment. *See id.* at 42. Mills also stated he did not want to just mail Mother a check on a monthly basis because he was concerned about whether she would actually receive it, as he mailed Mother a new Navy Federal card to be able to provide her with money, but she claimed that she did not receive it. *See id.* at 43-44.

Mills testified he was certain he was Child's biological father, but he then admitted he requested genetic testing after Mother filed a complaint for child support because he had become uncertain about his paternity. *See id.* at 37-38. Despite the fact that the genetic testing ruled him out as Child's biological father, Mills testified he wants to continue seeing Child, whom he considers

his son. *See id.* at 23. Mills does not believe Child has suffered due to the contentious relationship between him and Mother. *See id.* at 34-35.

Father testified he first learned Child was his son when Mother contacted him in July 2024. *See id.* at 66. Prior to that date, he did not know Mother was pregnant or that it was even possible he had a son. *See id.* at 67-68. Father completed a DNA test in August 2024 and immediately began daily video calls to start developing a bond with Child. *See id.* at 68. Since then, Father has spent time with Child at his home in Alabama for a week or two at a time, and, during a December 2024 visit, they went to parks, spent Father's birthday and Christmas together, and Child met Father's aunt, uncles, parents, grandparents, and cousins, some of whom are around his age. *See id.* at 71, 77. Child calls Father "Daddy." *Id.* at 70-71. Father described his bond with Child and that having Child in his life has been "one of the best times of [his] life." *Id.* at 74. Child is affectionate with Father and calls Father's fiancé, Tiffany, "Tee-Tee." *Id.* When Child is with Father, either Father or Tiffany cooks his meals, tucks him in at night, and reads to him in his bedroom. *See id.* at 72-73.

Father sends Mother diapers, clothes, and anything Child might need, and the daily video calls still were continuing at the time of the March 2025 hearing. *See id.* at 69, 72. Father said he wanted to put Child on his health insurance policy but was unsuccessful because Mills is named on the birth certificate. *See id.* at 73.

Father testified he does not consent to Mills acting as Child's father and that he would like to "assert [his] rights as a father." ***Id.*** at 75. If he had any knowledge of Child's existence before summer 2024, he would have acted to assert his rights as Child's father sooner. ***See id.*** at 76.

Finally, Mother challenged Mills' version of how long she and Child lived with him before his deployment, testifying that it was only two weeks, not two months. ***See id.*** at 92-93. Mother testified that, after Child would return from time with Mills, he would have a week adjustment period in which he was unable to sleep, misbehaved, bit others, was aggravated and generally acted out. ***See id.*** at 82-83. In contrast, Mother testified that Father's influence on Child is positive, with no adjustment period needed after visits. ***See id.*** at 82-83. She said Child seems attached to Father, who is like a member of the household, although he lives thirteen hours away. ***See id.*** at 83-84. Mother is able to speak with Child more often when he is at Father's home compared to Mills' home. ***See id.*** at 85-86.

Mother testified she does not need Mills to provide Child with health insurance because she has Child on state health insurance. ***See id.*** at 90. Mills has never paid any of Child's medical bills despite Mother providing Mills with them. ***See id.*** at 92. Mills has not provided money for medical expenses, daycare or any other expenses for Child over the last year and a half and, when he had provided support while deployed, he used it as a means to control her, cutting off money when they were in arguments. ***See id.*** at 81, 91-92. Mother testified she has not received any support from Mills in the last year

and a half. *See id.* at 80. Mother described her fear of Mills due to his threats that he would take Child, his anger if they disagreed and his controlling attitude. *See id.* at 86.

Mother testified she has her own apartment and works full time at a restaurant, making between $500-$900 per week. *See id.* at 95. Child's guardian ad litem ("GAL") stated it is in child's best interest to deny Mills standing so that Father can assert full parental duties and that, due to Child's young age, there will be no harm in severing the relationship. *See id.* at 134-36.

After briefing and a hearing, the court issued the June 20, 2025 order finding Mills has *in loco parentis* standing. Father filed a timely notice of appeal and contemporaneous Rule 1925(b) statement of errors. *See* Pa.R.A.P. 1925(a)(2)(i), (b).

On July 18, 2025, Mills filed a Motion to Reinstate custody periods that the court granted on July 23, 2025, without a hearing, ordering that Mills was entitled to one seven-day period of custody in August 2025, and one phone call per week, pending an evidentiary hearing for the court to perform a best interests analysis considering all custody factors to be scheduled after an upcoming September 2, 2025 pre-trial conference. Father filed a motion for reconsideration. On August 22, 2025, the court issued an order staying any interim custody awards to Mills. Father filed a timely appeal from the July 23, 2025 custody award and a contemporaneous Rule 1925(b) statement of

errors. *See id.* The court filed Rule 1925(a) opinions on August 30, 2025. *See* Pa.R.A.P. 1925(a).

Father raises two issues for our review.

1. [Whether t]he trial court committed an abuse of discretion and error of law by granting standing to [Mills] pursuant to 23 Pa.C.S.A. § 5324(2), where Mills did not have the consent of [Father] to stand *in loco parentis*, and only [Father] had acted as [Child's] [f]ather since October 2024[?]

2. [Whether t]he trial court committed an abuse of discretion and error of law by finding that it is in [Child's] best interest for Mills to be granted standing pursuant to 23 Pa.C.S.A. §5324(2)[?]

Appellant's Brief, at 1, 8.

Because Father's issues are related, we address them together. We begin our review with the general principles related to standing in matters of child custody:

The fundamental concept of standing ensures that a party seeking to litigate a matter has a substantial, direct, and immediate interest in the subject-matter of the litigation. In the area of child custody, principles of standing have been applied with particular scrupulousness[.] This stringent application of standing principles serves to protect both the interest of the court system by ensuring that actions are litigated by appropriate parties and the interest in keeping a family unit free from intrusion by those that are merely strangers, however well-meaning. The liberty interest of parents in the care, custody and control of their children-is perhaps the oldest fundamental liberty interest recognized by [the United States Supreme] Court. Determining standing in custody disputes is a threshold issue that must be resolved before proceeding to the merits of the underlying custody action. It is a conceptually distinct legal question which has no bearing on the central issue within the custody action-who is entitled to physical and legal custody of a child in light of his or her best interests. Issues of standing are questions of law; thus, the standard of review is de novo and the scope of review is plenary.

*Hunt v. Vardaro*, 317 A.3d 1046, 1049 (Pa. Super. 2024) (ellipses, quotation marks, and citations omitted). "Our plenary scope of review is of the broadest type; that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported." *Id.* (brackets and citation omitted).

Here, Father argues the court erred in granting Mills standing because Mills's connection to Child is not significant enough to disregard Father and Mother's lack of consent. *See* Appellant's Brief, at 5-8. Further, Father maintains that there is not so strong a psychological bond between Child and Mills that it is in Child's best interest to grant standing to Mills over Father and Mother's objection. *See id.* at 8-10.

Mills counters the court properly granted him with *in loco parentis* standing because he has taken every opportunity to act as a parent for Child and to provide for him financially. *See* Appellee's Brief, at 5, 15.

The United States Supreme Court has "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxell v. Granville*, 530 U.S. 57, 66 (2000). Therefore, "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best

decisions concerning the rearing of that parent's children." **Id.** at 68-69 (citation omitted).

Accordingly, the Pennsylvania Custody Act ("Act")[3] "generally does not permit third parties to seek custody of a child contrary to the wishes of that child's parents. The Act provides several exceptions to this rule." **Hunt**, 317 A.3d at 1050 (ellipses and citation omitted). Section 5324(2) of the Act, which provides that an individual person who stands *in loco parentis* to a child "may file an action … for any form of physical custody or legal custody," is pertinent to our review here. 23 Pa.C.S.A. § 5324(2).

> [T]he term *in loco parentis* literally means in the place of a parent. A person stands *in loco parentis* with respect to a child when he or she assumes the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas: first, the assumption of a parental status, and, second, the discharge of parental duties. Critical to our discussion here, *in loco parentis* status cannot be achieved without the consent and knowledge of, and in disregard of, the wishes of a parent.

**K.W. v. S.L.**, 157 A.3d 498, 504-05 (Pa. Super. 2017) (quotation marks and citations omitted); **see also D.G. v. D.B.**, 91 A.3d 706, 708-09 (Pa. Super. 2014) ("The third party in this type of relationship … cannot place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship.") (citation omitted).

---

[3] 23 Pa.C.S.A. § § 5321-5340.

"The plain language of the [custody] statute reads 'A person who **stands** … *in loco parentis* [to] the child.' 23 Pa.C.S.A. § 5324. 'Stands' is the present tense of the verb 'stand.'" **Hunt**, 317 A.3d at 1051 (emphasis in original). Therefore, the question is whether the person is presently exercising parental duties. **See id.** "Parental duties" are not simply or easily defined, but are "best understood in relation to the needs of a child. A child needs love, protection, guidance, and support." **In re K.Z.S.**, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

Instantly, in determining whether Mills has *in loco parentis* status, the trial court found the appropriate time for consideration was from Child's birth until the court stayed Mills's periods of custody on October 21, 2024. **See** Trial Court Opinion, 6/30/25, at 7. In finding Mills has *in loco parentis* standing, the court reasoned that, since his return from deployment, Mills has exercised his periods of custody and maintained phone and video contact with Child. **See id.** at 8. The court emphasized that Mills covers Child on his health insurance, lists Child as a dependent for military benefits, and has a savings account for Child with approximately $2,000 in it. **See id.** at 9. The court acknowledged that Mills has not provided any financial support for Child for sixteen months and that, when he provided Mother use of a Navy credit union card to access funds, he utilized this as a means of control. The court also found Mills' claim he was unable to provide any financial support over the last sixteen months disingenuous in light of his $76,000 annual salary. **See id.** at 10. However,

the court found Mills' actions were sufficient to establish standing. ***See id.*** at 15.

We commend the trial court on its thorough analysis of this case. It did a thoughtful and exemplary job navigating the conflicting positions of all parties. However, after our own *de novo* review, we are constrained to disagree with the court's conclusion that Mills stands *in loco parentis* to Child.

First, although the court stated that the relevant period was before October 2024, when Mills' physical custody of Child was stayed, our *de novo* standard of review demands we review the entire record. Moreover, pursuant to **Hunt**, the pertinent question is whether Mills currently stands *in loco parentis* to Child. **See Hunt**, 317 A.3d at 1051. After reviewing the hearing transcript, the history of this case, and the present conditions, it is clear that, currently, and in at least the last sixteen months, Mills has failed to assume parental status in the fulfillment of parental duties and any relationship he formed with Child in the very brief period he lived with him and over the sporadic seven or eight weeks of custodial care between November 2023 and September 2024, is insufficient to overcome Mother's and Father's lack of consent.

Mills lived with Child and Mother for less than a month. For the next year, Mills provided support during his deployment, but he did so as a means to control Mother, withholding money so Mother was not able to buy formula or gas to transport Child if they were in a disagreement. Although naming

Child as his dependent for his military benefits can be evidence of *in loco parentis* standing, **see M.L.S. v. T.H.-S.**, 195 A.3d 265, 267 (Pa. Super. 2018), this is but one consideration. It is undisputed that Mills has not provided any financial support for Child in the last sixteen months, and Mother stated he has never paid any medical bills. Although Mills provides Child with health insurance, Mother stated it is not needed since she Child is covered elsewhere. Not to mention, Father wants to put Child on his health insurance, but cannot do so under the current circumstances. While Mills has a savings account for Child, the $2,200 it holds is the tax credit he received after improperly claiming Child on his 2023 tax return. It is undisputed that Child has always lived primarily with Mother, so Mills should not have claimed him on his tax return, let alone receive a $2,200 tax credit that should have gone to Mother for her care of Child. Further, despite his claim that he never questioned his paternity of Child and that it does not matter to him if he is Child's biological father, his attitude about parentage clearly changed as soon as Mother filed a child support action against him.

Child has not lived with Mills since the brief period in the spring of 2022 when Child was a newborn. While Mills did have telephone and video contact with Child, between November 2023 and September 2024, Mills only had physical custody of Child for seven or eight non-sequential weeks. Due to the 21-hour distance between them, Mills has not been present for any of Child's

medical appointments or provided this very young Child with any daily care other than that provided while in his custody.

We find further support for this decision where there is absolutely no evidence that Father is unfit to parent Child. As soon as Father learned Child could be his biological son, Father immediately confirmed he was Child's biological father, and began developing a bond with Child, who now calls him Daddy. Father fulfills parental duties, providing Mother with financial resources, diapers, clothing, and anything Child might need. Father described his strong bond with Child, his wish to assert his rights as a father, and the fact that he is not okay with Mills acting in a parental role and that, if he had known of Child sooner, he would have asserted his rights at that time. Mother stated that Father is so involved in Child's life it is like he is a member of the household, despite the 13-hour distance between them. Importantly, Child's GAL stated it is in Child's best interest to deny Mills standing to allow Father to exercise his rights and that, based on Child's young age, there will be no harm to Child in severing the relationship with Mills. *See id.* at 134-36. If there is going to be a severance of the contacts by Mills, clearly desired by Mother and Father, now is the time rather than later in the child's life.

Based on the foregoing, we cannot find that Mills meaningfully fulfills a parental role, or that it is in Child's best interest to confuse him by forcing a relationship with Mills against Child's biological parents' wishes. There is no benefit to Child to continue these contacts. Child is only approximately three

- 17 -

years old now. Any tenuous relationship forged with Mills is not significant enough to override Child's biological parents' wishes and the benefits of having a Mother and Father who care for him and are cooperative with each other.

Accordingly, we are constrained to reverse the trial court's order granting Mills' petition for standing. Because Mills lacks standing to pursue custody, we also reverse the court's custody order.

Orders reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 01/08/2026