J-S01016-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| NICOLE JORDAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| COREY RUBRIGHT | : | |
| | : | |
| | : | No. 1176 WDA 2025 |
| APPEAL OF: BETH RUBRIGHT | : | |

Appeal from the Order Entered September 21, 2025
In the Court of Common Pleas of Westmoreland County
Domestic Relations at No(s):  18DO01613

BEFORE:   BOWES, J., PANELLA, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.:          **FILED: February 24, 2026**

Beth Rubright ("Paternal Grandmother") appeals from the order dismissing her petition to intervene and seek custody rights of her two minor grandchildren, C.R., born February 2018, and R.R., born July 2019 (collectively, the "Children"). She argues the trial court committed reversable error by concluding she had not established standing. We find that the trial court did not err, and therefore affirm.

Rubright's son, Corey Rubright ("Father"), is the natural father of the Children, and appellee Nicole Jordan ("Mother") is the natural mother. Paternal Grandmother petitioned the court to intervene in an ongoing custody action between Father and Mother, which was initiated in 2018.

---

[*] Former Justice specially assigned to the Superior Court.

On September 4, 2018, Mother filed a complaint for custody, seeking sole legal custody and primary physical custody of C.R., who was 5 months old at the time. On the same day, Mother filed a petition for emergency relief, asserting that Father was keeping C.R. from her. That day, the court granted Mother's petition for emergency relief, ordering Father to immediately turn over custody of C.R. to Mother.

On September 11, 2018, following an emergency custody hearing, the court entered an order formalizing that the parties had consented to share legal and physical custody of C.R. equally between Mother and Father.

On April 29, 2019, Mother filed a petition for emergency relief, again asserting that Father was keeping C.R. from her. That same day, the court entered an order directing the parties to follow the September 2018 consent order, and directing Father to turn over custody of C.R. that day.

On May 2, 2019, following a hearing on Mother's petition for emergency relief, the court entered a custody order, whereby the parties were to share physical custody of C.R. on a 2-2-3 schedule.

On August 15, 2019, the court ordered that the custody arrangement for the parties' new child, R.R., born following the most recent order of court, be incorporated into this case. Specifically, the court ordered that the May 2, 2019 custody order remain in full force and effect as to both C.R. and R.R., and that R.R. would be subject to any future custody orders as well.

On March 4, 2021, Mother filed a petition for contempt against Father, asserting Father had not been following the custody order since May 2020, and was forcing Mother to visit the Children at his house during her custodial periods. Father subsequently filed a petition for special relief, contending he "only allowed visits under his supervision because [Mother] was in rehab in November 2020 for 30 days" and he had "reason to believe [Mother] is still using illegal drugs since her completion of the rehab program." Petition for Special Relief, 3/10/21. Father requested that Mother's custodial time be supervised by an adult individual agreed upon by the parties until Mother underwent a hair follicle test. *See id.* Based on the above two petitions, and by agreement of the parties, the court ordered both parties to submit to drug screening, and scheduled a hearing on the petitions.

On March 25, 2021, following a hearing, the court entered a consent custody order, whereby the parties shared legal custody and shared physical custody of the Children on a 50/50 basis, with a 3-day alternating schedule.

On July 20, 2021, Mother filed a petition for contempt, asserting she had not received the Children for her agreed upon custodial periods since the entry of the March 2021 custody order.

On September 22, 2021, following a conciliation conference that Mother attended but Father did not, the court dismissed Mother's petition for contempt without prejudice. The court reminded the parties to follow the custody provisions in the prior order of court, and stated that Mother could

file another petition for contempt if Father continued to deny her the court ordered scheduled custodial time.

On September 27, 2021, Mother filed a petition for modification of custody, asserting that Father continued to refuse to allow Mother her full shared custody time, and seeking primary physical custody of the children. On December 1, 2021, the court entered an order, by consent of the parties, cancelling a scheduled custody modification conference, and directing that the March 2021 custody order remain in full force and effect.

On May 10, 2024, Mother filed a petition for contempt, asserting that Father was again not allowing her to get the Children pursuant to the custody agreement, and that she had not seen the Children in two months. Following a conciliation conference, the court dismissed the petition, but advised Father that any further denial of Mother's full custodial time would subject him to a potential finding of contempt with sanctions. The court again reminded the parties to follow the March 2021 custody order.

On February 13, 2025, Mother filed another petition for modification of the March 2021 custody order. Mother asserted that despite both Mother and Father obtaining their own suitable housing, the Children remained at Paternal Grandmother's home, where Paternal Grandmother was primarily responsible for their care, with Father only returning intermittently to visit the Children. Mother also asserted that Father and Paternal Grandmother frequently and consistently refused to permit Mother to have any custodial time, let alone

time consistent with the current custody order. Accordingly, Mother sought primary custody of the Children, and partial custody for Father.

Following a custody conciliation conference on March 14, 2025, the court entered a custody order, directing the parties to share legal custody of the Children, and to share physical custody, with Mother having physical custody each week from Thursday when she picks them up from school, until Monday when she drops them off at school, and Father having physical custody each week from Monday when he picks them up from school until Thursday when he drops them off at school.

On March 28, 2025, Mother filed a petition for contempt, asserting that Father continued to fail to adhere to the custody order, by failing to consult with Mother on matters affecting the welfare of the Children, denying Mother telephone contact with the Children, regularly disparaging Mother to the Children, and allowing Paternal Grandmother to disparage Mother to the Children, thereby alienating the Children from Mother. Mother contended that at the March 14, 2025 conciliation conference, Father had agreed to allow the Children to go to Mother's house on the weekends; however, since the conference, Father had only allowed R.R. to spend 2 overnights with Mother and C.R. had not spent any overnights with Mother.

On April 24, 2025, following a conference, the court entered an order granting primary physical custody to Mother, based on the court's finding that it was clear that Mother was being refused and prevented from exercising her

periods of physical custody. Father was given partial physical custody on Saturdays and Sundays from 10:00 a.m. until 6:00 p.m. on the first, third, fourth, and in instances where a particular month has five weekends, the fifth weekend of the month.

Paternal Grandmother subsequently presented to the court a petition to intervene in this custody matter,[1] followed by a petition for emergency relief, seeking custody of the Children. Paternal Grandmother asserted that the Children had lived with her since birth and she had been their only caregiver. Paternal Grandmother noted concerns about Mother's boyfriend and his brother who she alleged both lived with Mother. Paternal Grandmother also noted her concerns about C.R.'s mental health since the child was taken out of her home. Finally, Grandmother indicated that Father had never cared for the Children on his own.

The trial court succinctly summarized the testimony from a hearing held on Paternal Grandmother's petitions as follows:

_____

[1] The certified record does not include a copy of the petition to intervene. The court notes in its opinion that the petition was presented to the court during open motions court on May 9, 2025, and that following its presentation, a hearing was scheduled on the petition for June 23, 2025. The court observes that the record does not show the petition was filed with the prothonotary's office. On the day of the scheduled hearing, Paternal Grandmother appeared at the wrong courtroom, which led to postponement of the hearing. In the interim, Paternal Grandmother filed a petition for emergency relief. The court scheduled a hearing on the emergency petition to coincide with the petition to intervene. As none of the parties dispute the existence of the petition to intervene, we do not find its absence from the record hampers our review.

During the hearing on July 16, 2025, [Paternal] Grandmother, Mother and Father each testified as to the history of the involvement of [Paternal] Grandmother in the lives of the [C]hildren and the circumstances under which the parents exercised, or failed to exercise, custody as prescribed in the [o]rders of [c]ourt [] which granted shared physical custody to the parents. Testimony indicated that there had been significant periods of time during which the Children[,] while Father was to be exercising his periods of physical custody, were residing in Paternal Grandmother's home. Mother credibly testified that, during the periods that she obtained her own independent housing, she found it difficult to regain custody from Father. [Paternal] Grandmother even testified that she would not turn the [C]hildren over to Mother during her scheduled periods of custody when asked to do so. Both parties also indicated that they had been secretive about their living situations due to allegations of abuse on both sides. Additionally, despite several referrals to the county child welfare agency, no evidence was put forth to indicate that the [C]hildren were approaching the definition of dependent under the Juvenile Act, 42 Pa. C.S.A § 6301 et al.

Trial Court Opinion, 11/19/25, at 2.

On August 21, 2025, the court entered an order denying both the petition to intervene and the petition for emergency custody, finding that, pursuant to 23 Pa.C.S.A. § 5324(3) and 23 Pa.C.S.A. § 5325(2), Paternal Grandmother had failed to demonstrate sufficient evidence to support intervention in the case, and that no emergency condition existed at that time. This timely appeal followed.[2]

On appeal, Paternal Grandmother contends the trial court erred in finding she did not have standing to intervene in this custody matter. First,

_____

[2] Paternal Grandmother filed a motion for reconsideration of the petition to intervene on the same day as the notice of appeal,. The court did not respond to this motion, which was rendered moot by Paternal Grandmother's appeal.

- 7 -

she argues the trial court erred by not evaluating her standing pursuant to Section 5324(2). *See* Appellant's Brief, at 8. Second, she argues the trial court erred in finding she failed to demonstrate sufficient evidence to support her standing pursuant to Section 5324(3). *See id.* at 10.

We begin our review with the general principles related to standing in matters of child custody:

> The fundamental concept of standing ensures that a party seeking to litigate a matter has a substantial, direct, and immediate interest in the subject-matter of the litigation. In the area of child custody, principles of standing have been applied with particular scrupulousness[.] This stringent application of standing principles serves to protect both the interest of the court system by ensuring that actions are litigated by appropriate parties and the interest in keeping a family unit free from intrusion by those that are merely strangers, however well-meaning. The liberty interest of parents in the care, custody and control of their children-is perhaps the oldest fundamental liberty interest recognized by [the United States Supreme] Court. Determining standing in custody disputes is a threshold issue that must be resolved before proceeding to the merits of the underlying custody action. It is a conceptually distinct legal question which has no bearing on the central issue within the custody action-who is entitled to physical and legal custody of a child in light of his or her best interests. Issues of standing are questions of law; thus, the standard of review is de novo and the scope of review is plenary.

*Hunt v. Vardaro*, 317 A.3d 1046, 1049 (Pa. Super. 2024) (ellipses, quotation marks, and citations omitted). "Our plenary scope of review is of the broadest type; that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported." *Id.* (brackets and citation omitted).

We defer to the competent credibility and weight assessments of the trial court, who had the opportunity to observe evidence and witnesses first-hand. **See V.B. v. J.E.B.**, 55 A.3d 1193, 1197 (Pa. Super. 2012). We can reverse only if the conclusions of the trial court constitute an error of law or are unreasonable when considering the evidence in the record. **See id.** Since custody cases are fluid, a court should assess the circumstances as they currently exist when determining standing. **See M.W. v. S.T.**, 196 A.3d 1065, 1071 (Pa. Super. 2018).

The United States Supreme Court has "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children." **Troxell v. Granville**, 530 U.S. 57, 66 (2000). Therefore, "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." **Id.** at 68-69 (citation omitted).

Accordingly, the Pennsylvania Custody Act ("Act")[3] "generally does not permit third parties to seek custody of a child contrary to the wishes of that child's parents. The Act provides several exceptions to this rule." **Hunt**, 317 A.3d at 1050 (ellipses and citation omitted). Section 5324(2) of the Act, which

---

[3] 23 Pa.C.S.A. §§ 5321-5340.

provides that an individual person who stands *in loco parentis* to a child "may file an action … for any form of physical custody or legal custody," is pertinent to our review here. 23 Pa.C.S.A. § 5324(2).

> [T]he term *in loco parentis* literally means in the place of a parent. A person stands *in loco parentis* with respect to a child when he or she assumes the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas: first, the assumption of a parental status, and, second, the discharge of parental duties. Critical to our discussion here, *in loco parentis* status cannot be achieved without the consent and knowledge of, and in disregard of, the wishes of a parent.

***K.W. v. S.L.***, 157 A.3d 498, 504-05 (Pa. Super. 2017) (quotation marks and citations omitted); ***see also D.G. v. D.B.***, 91 A.3d 706, 708-09 (Pa. Super. 2014) ("The third party in this type of relationship … cannot place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship.") (citation omitted).

Instantly, in determining whether Paternal Grandmother has *in loco parentis* status, the trial court found a factual distinction between Paternal Grandmother providing support for her son and her performing parental duties in place of Father. **See** Trial Court Opinion, 10/14/25, at 4.

Based on the record, there is simply no evidence that Mother ever acquiesced to Paternal Grandmother standing *in loco parentis* to the Children. Mother certainly knew that the Children were staying at Paternal Grandmother's home during Father's custodial time, and admitted that Paternal Grandmother helped her out at times by watching the Children. **See**

N.T., 7/16/25, at 35. Accordingly, while it is undisputed that the Children have lived at Paternal Grandmother's home for extended periods of time, the testimony also shows that much of this time was made up of Father's custodial time, as well as a number of periods of time where Mother claimed Father was refusing to allow Mother to exercise her custodial time. While Paternal Grandmother has certainly stepped up to take care of the Children during Father's custodial time, when frankly Father should have been taking care of the Children, the record in front of us shows that Paternal Grandmother also often placed herself *in loco parentis* in defiance of Mother's wishes and right to equally exercise her own custodial time.

We find further support for the trial court's decision because there is absolutely no evidence that Mother is unfit to parent the Children. Mother has continuously attempted to assert her rights as a mother, despite the numerous contempt petitions she has had to file against Father, who has seemingly kept the Children away from Mother. ***See D.G.***, 91 A.3d at 708-09.

Accordingly, we find Paternal Grandmother has not established standing pursuant to Section 5324(2).

Next, Paternal Grandmother asserts she alternatively established standing as a grandparent under Section 5324(3), which permits a custody action by a grandparent who is not *in loco* parentis, but:

> (i) whose relationship with the child began either with the consent
> of a parent of the child or under a court order;

(ii) who assumes or is willing to assume responsibility for the child; and

(iii) when one of the following conditions is met:

(A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);

(B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or

(C) the child has, for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.

23 Pa.C.S.A. § 5324(3).[4]

Paternal Grandmother contends that her relationship with the Children began with the consent of both parents; she is willing to assume responsibility for the Children; and the action was filed within weeks of Mother removing the Children from her home **See** Appellant's Brief, at 10-11; **see also** 23 Pa.C.S.A. § 5324(3).

The trial court found that the testimony did not show the Children have been removed from Grandmother's home, rendering her unable to see them. Rather, the testimony at the hearing showed that, since Mother was granted primary physical custody, Father continues to allow the Children to stay at Paternal Grandmother's home during his partial custodial time. **See** N.T.,

---

[4] There is no contention the Children are dependent under the Juvenile Act, or that they are substantially at risk.

7/16/25, at 9-10. Even during Mother's custodial time, Mother has asked Paternal Grandmother for help watching the Children when Mother needed to attend classes for a certification program she is completing. **See id.** at 35. Accordingly, we agree with the trial court that the facts of this case do not warrant court intervention where Paternal Grandmother's contact has not been cut off. "The statute was enacted to protect against estrangement that might occur after one parent dies, or after the parents separate or divorce and custody of the child is with one parent, or after the child has lived with the grandparents for a significant period of time and is removed by the parents." **Gradwell v. Strausser**, 610 A.2d 999, 1004 (Pa. Super. 1992). That is simply not the case here, where Paternal Grandmother continues to exercise time with the Children, albeit less time than she would prefer.

Based on the above, Paternal Grandmother has not established the court's findings were unreasonable when viewed against the evidence of record.

Order affirmed.

President Judge Emeritus Stevens joins the memorandum.

Judge Bowes concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

2/24/2026