J-A08034-26

2026 PA Super 126

| C.M.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| H.M. | : | |
| | : | |
| Appellant | : | No. 2336 EDA 2025 |
| | : | |

Appeal from the Order Entered August 15, 2025
In the Court of Common Pleas of Philadelphia County
Domestic Relations at No(s): 0C2400443

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and KING, J.

OPINION BY PANELLA, P.J.E.:                    **FILED JUNE 18, 2026**

H.M. appeals from the August 15, 2025 final custody order pertaining to her biological daughter, N.H.B.-F. ("Child"), born in July 2022. On appeal, H.M. challenges the trial court's finding that H.M.'s former partner, C.M.D., has standing to seek custody of Child. After careful consideration, we affirm pursuant to **Glover v. Junior**, 333 A.3d 323, 358 (Pa. 2025) ("**Glover**") (adopting "the doctrine of intent-based parentage" in Pennsylvania).

The trial court authored an apt and comprehensive summary of the extensive factual and procedural history of this matter, as follows:

> C.M.D. and H.M. [(collectively, "the parties") are both women] and met on OKCupid around January 2016. **See** N.T., 3/18/24, at 66. . . . They began [their] romantic relationship in Cincinnati,[ Ohio,] but H.M. remained in the closet to her family in London[, United Kingdom]. **See id.** at 67. . . . In March 2018, the parties broke up, before reconciling in late April 2018. **See id.** at 68. It is unclear from the record what the status of their relationship was [through] October 2018. During that—for lack of

a better term, complicated—period, H.M. began the process of potentially pursuing reproducing through [assistive reproductive technology ("ART")] by purchasing vials of sperm. *See id.* at 81.

In October 2018, H.M. began living with C.M.D. and in May 2019, H.M. fully vacated her own apartment upon the expiration of her lease. *See* N.T., 12/19/24, at 20. Shortly thereafter, H.M. began the process of egg retrieval for use in future [*in vitro* fertilization ("IVF")] procedures [through the University of Cincinnati ("UC")]. *See* N.T., 3/18/24, at 107-08. [H.M.] revealed to C.M.D. that she had already bought sperm from a sperm bank, but she offered to return it if C.M.D. wanted to participate in choosing the sperm donor. *See* N.T., 12/19/24, at 219. C.M.D. expressed that she was content with H.M.'s prior choice of sperm donor and agreed to move forward with that donor. *See id.* [Seventeen of H.M.'s] eggs were successfully retrieved, [six] of them were successfully fertilized with the [mutually approved] donor sperm, and [two] of the resulting embryos were viable for future implantation. *See* N.T., 3/18/24, at 108-09. The embryos were frozen in September 2019. *See* Exhibit P-11. [A]lthough the various medical forms H.M. filled out for her [first course of] fertility procedures included blanks for "partner" or "intended parent," these were left blank. *See* Exhibits C-F. In the event of H.M.'s death, [H.M. initially stipulated that] the embryos were to be entrusted to [her] sister, not C.M.D. *See* N.T., 1/3/25, at 136-37.

In 2020, H.M. underwent [intrauterine insemination ("IUI")] at UC and became pregnant in September 2020[,] while the parties were looking for a home to buy together in Philadelphia. *See* N.T., 12/12/24, at 172; N.T., 3/25/24, at 31-32. C.M.D. [took] H.M. to medical appointments and was included in discussions about the procedures. *See* N.T., 12/19/24, at 28, 217. Ultimately, the IUI pregnancy resulted in a miscarriage; the parties buried the remains of the miscarriage together. *See* N.T., 12/12/24, at 176.

In November 2020, the parties moved to Philadelphia [and] into a house they bought together. *See* N.T., 12/12/24, at 165; N.T., 3/18/24, at 47. Included in their bid for the house was a letter to the seller that said, among other things, "Your home immediately struck us as the home we see ourselves filling with music and raising a family in" and "We are excited to . . . welcome more children there." Exhibit P-10. H.M. put C.M.D. on her health

insurance as her "domestic partner" and C.M.D. remained insured under H.M.'s plan until [the end of their relationship.] N.T., 1/3/25, at 292. Later that same month, they began the [administrative] process of [transferring the previously frozen embryos to] Main Line Fertility Center [("Main Line Fertility") in Philadelphia, with the intent of the embryos being implanted into C.M.D.] *See* Exhibit P-11 [(listing C.M.D. as the "patient)]. Unlike the [UC] paperwork, all of the Main Line Fertility paperwork listed both C.M.D. and H.M. as "Patient" or "Partner (if applicable)." *Id.* Furthermore, H.M. changed the legal control of the embryos to [include both of the parties]. They updated the embryo disposition terms such that in the event of either's death, the embryos were to be entrusted to the "exclusive control" of the other. *See id.*; *see also* Exhibit C. . . . In [the spring of] 2021, H.M. underwent another round of IVF, [which] did not result in any viable embryos. *See* N.T., 1/3/25, at 141-42.

In May 2021, the parties decided to implant one of the two viable embryos into C.M.D., but it did not result in a successful pregnancy. *See id.* at 142; *see also* N.T., 12/12/24, at 192. Finally, in October 2021, the other viable embryo was implanted in H.M.[, which] resulted in a successful pregnancy and[,] eventually[,] the birth of Child in July 2022. *See* N.T., 1/3/25, at 143-44. The [successful] implantation procedure required the consent of both of the parties. *See* N.T., 1/3/25, at 294-98; N.T., 12/12/24, at 194-95; Exhibit P-12.

During H.M.'s pregnancy, C.M.D. drove H.M. to [her] doctor's appointments and came in when possible, although she was not always permitted to do so due to COVID restrictions. N.T., 12/12/24, at 196-97. H.M. texted "congratulations" to C.M.D. when Child's fetal heartbeat was detected. *Id.* at 197. And the healthcare staff at Main Line Fertility held H.M.'s phone to the ultrasound machine so C.M.D. could listen to the heartbeat. *See id.* C.M.D. took over a larger household role while H.M. was pregnant. *See id.* at 198. C.M.D. administered progesterone shots to H.M. in their home. *See id.* C.M.D. underwent a months[-]long process to induce lactation. *See id.* at 202-03. When C.M.D. was eventually successful in inducing lactation, H.M. thanked C.M.D. for all she was doing. *See* N.T., 1/3/25, at 161-62, 307. During the pregnancy, H.M. gave C.M.D. a Valentine's Day card that, among other things, said: "Can you believe our little family grows both in love and in numbers?" *Id.* at 315-16; Exhibit P-40. The parties both scheduled and later took parental

leave for the birth of Child. *See* N.T., 12/12/24, at 199, 210. C.M.D.'s church threw a baby shower for the parties. *See* N.T., 1/3/25, at 304.

[The parties also] collaborated on determining Child's name. *See* Exhibit P-15. Child was ultimately given four names, two of which drew from C.M.D.'s side of the family and two of which met H.M.'s priorities for simplicity and heritage. *See* N.T., 1/3/25, at 154-57; N.T., 12/12/24, at 213-15. The parties discussed whether to put C.M.D.'s name on the birth certificate. *See* N.T., 1/3/25, at 152. They ultimately did not do so because of a belief that they could not legally do so while unmarried. *See* N.T., 1/3/25, at 152; N.T., 12/19/24, at 220-21. The parties also consulted with an attorney about the possibility of C.M.D. adopting Child, but they ultimately never moved forward with that. *See* N.T., 3/25/24, at 66-67.

When Child was born, C.M.D. was in the birthing room with H.M. and caught Child, cut the umbilical cord, and had skin-to-skin time in the birthing suite. *See* N.T., 1/3/25, at 305; N.T., 12/12/24, at 206. Child drank C.M.D.'s breastmilk in the hospital. *See* N.T., 12/12/24, at 208. When Child's bilirubin levels were high, C.M.D. alone took Child to a medical appointment while H.M. was recovering from delivery. *See* N.T., 1/3/25, at 167. C.M.D. and H.M. took Child together to subsequent appointments. *See* N.T., 1/3/25, at 167, 397-400. C.M.D. also took on an outsized role in managing the household during H.M.'s recovery. *See* N.T., 1/3/25, at 320-21; N.T., 12/12/24, at 207-10. Both of the parties breastfed Child, although H.M. did the majority of the breastfeeding. *See* N.T., 1/3/25, at 307-08; N.T., 12/12/24, at 220-22.

Contemporaneously, C.M.D. sent out a birth announcement, including H.M., referencing both C.M.D. and H.M. as parents of Child. *See* Exhibit P-16. H.M. did not object publicly (to the recipients of the announcement) or privately (to C.M.D.) to C.M.D.'s characterization of both C.M.D. and H.M. as parents or the characterization of Child as "our daughter." *See* N.T., 1/3/25, at 396. H.M. sent out a separate announcement to her family (who did not know her sexual orientation) that did not reference C.M.D. *See id.* at 396. On August 12, 2022, seventeen days after Child was born, H.M. gave C.M.D. a birthday card which contained statements like "baby girl has joined us," "what an incredible time of parenting, of growing as a family," "here's to

your birthday with [Child]," "you're an incredible mom," and "looking forward to our journeys together as a family." Exhibit P-36.

C.M.D.'s family sent several cards to H.M., C.M.D., and Child[,] which explicitly referred to both H.M. and C.M.D. as mothers to Child and C.M.D.'s parents as Child's grandparents. **See** Exhibits P-1, P-2, P-3, and P-4. H.M. did not object to [these characterizations]. **See** N.T., 3/18/24, at 32. C.M.D.'s father sent a family heirloom to Child, a shadowbox made from a piece of [his] crib. **See** Exhibit P-5. H.M. did not suggest that this was odd or that Child was not part of C.M.D.'s family. **See** N.T., 3/18/24, at 31-32. C.M.D.'s mother visited to see Child and H.M. took "family photos" of C.M.D., C.M.D.'s mother, and Child. **See** N.T., 12/12/24, at 53-55; Exhibits P-6 and P-7. C.M.D.'s mother retired, partially, so she would be able to spend more time supporting H.M. and C.M.D. by providing care for Child. **See** N.T., 12/12/24, at 78. H.M. also arranged for a professional photographer to take family photos of the parties and Child. **See** N.T., 1/3/25, at 443-45; C.M.D.'s Exhibit 14. C.M.D.'s mother referred to C.M.D. as Child's mother in H.M.'s presence and H.M. did not correct her. **See** N.T., 1/3/25, at 451-52. The parties collaborated on finding a daycare for Child and ultimately chose a daycare that C.M.D. suggested. **See** N.T., 1/3/25, at 175; N.T., 12/12/24, at 274. C.M.D. contributed financially for the daycare expenses[,] but H.M. chose not to use the contributions. **See** N.T., 12/19/24, at 43-44.

In December 2022, due to tension in their relationship, C.M.D. moved out of their bedroom and into the guest room. **See** N.T., 3/18/24, at 111. In May or June 2023, as the relationship continued to deteriorate, C.M.D. moved out of the house and into a "carriage house" immediately adjacent. **See** N.T., 12/12/24, at 161; N.T., 3/18/24, at 68. C.M.D. continued to see Child "almost daily," including dropping her off at and picking her up from daycare and usually spending two hours with Child on Thursday evenings. **See** N.T., 1/3/25, at 114, 177; N.T., 12/19/24, at 224; N.T., 12/12/24, at 159, 226-27. H.M. lived with and cared for Child in H.M.'s and C.M.D.'s house in Philadelphia. **See** N.T., 1/3/25, at 110. Around February 2024, H.M. moved out of the house with Child. **See id.** at 116. H.M. refused to disclose to C.M.D. her new address. **See** N.T., 12/12/24, at 236-37.

Trial Court Opinion, 10/9/25, at 1-6 (cleaned up).

C.M.D. initiated these proceedings by filing a custody complaint on March 7, 2024, wherein she requested shared legal and physical custody of Child and asserted that she was Child's "non-biological parent." **See** Complaint for Custody, 3/7/24, at ¶¶ 3, 5. Due to H.M.'s status as a citizen of the United Kingdom, C.M.D. requested the entry of "an order preventing Child from leaving the country until a custody order is issued." **Id.** at ¶ 15. The same day, C.M.D. also filed an emergency custody complaint requesting the same relief. **See generally** Emergency Complaint for Custody, 3/7/24, at ¶¶ 1-15. The case was initially assigned to the Honorable Mark B. Cohen of the Philadelphia County Court of Common Pleas ("Judge Cohen").

On March 11, 2024, Judge Cohen held the first custody hearing, at which both parties appeared with counsel. **See** N.T., 3/11/24, at 3-5. Therein, H.M. made an oral motion to dismiss C.M.D.'s complaints based upon her alleged lack of standing to seek custody of Child **See** N.T., 3/11/24, at 5. C.M.D. maintained her standing was based upon the newly announced paradigm of "parentage by intent" pursuant to **Glover v. Junior**, 306 A.3d 899 (Pa. Super. 2023) (*en banc*), *affirmed on appeal*, 333 A.3d 323 (Pa. 2025).[1] **See id.** at 11. The same day, Judge Cohen entered an interim custody order precluding H.M. from leaving the Commonwealth. **See** Order, 3/11/24, at 1.

_____

[1] At the time C.M.D. made these arguments, this Court's *en banc* holding in **Glover** was on appeal in the Supreme Court of Pennsylvania.

On March 18, 2024, H.M. filed formal preliminary objections asserting, *inter alia*, that C.M.D. lacked standing. **See** Preliminary Objections, 3/18/24, at ¶¶ 105-57. The same day, H.M. also filed a petition requesting a protracted hearing on the issue of C.M.D.'s standing to seek custody.

Also on March 18, 2024, Judge Cohen held a second custody hearing. Therein, C.M.D. expanded upon her initial arguments and asserted that she had standing to seek custody based upon, *inter alia*, intent and *in loco parentis*. **See** N.T., 3/18/24, at 6-9. H.M. responded that paternity by intent was not permitted pursuant to **C.G. v. J.H.**, 193 A.3d 891 (Pa. 2018). **See** **id.** at 10-14. This hearing was largely focused upon whether or not there was a custody emergency that required immediate action by the trial court. **See** **id.** at 16-22. While Judge Cohen had already entered an order prohibiting H.M. from leaving Pennsylvania, C.M.D. claimed that H.M. had also been withholding Child from her. **See id.** at 16. At the conclusion of the hearing, Judge Cohen filed an order that, *inter alia*, scheduled a hearing for March 25, 2024, to permit H.M. to present evidence and argument concerning her preliminary objections. **See** Order, 3/18/24, at 1.

On March 25, 2024, the hearing regarding H.M.'s preliminary objections took place as scheduled. The parties each testified and introduced a number of additional documentary exhibits into evidence. Thereafter, the trial court filed a "temporary" order that provided, in pertinent part, as follows:

> THE EMERGENCY PETITION FILED MARCH 7, 2024 IS HEREBY GRANTED. [C.M.D.] IS FOUND TO BE A PARENT TO THE CHILD

FOR THE PURPOSES OF THE EMERGENCY PETITION, UNTIL OR UNLESS OTHERWISE DETERMINED AT A FUTURE HEARING. [C.M.D.] SHALL HAVE PARTIAL PHYSICAL CUSTODY OF [CHILD] STARTING FROM PICK UP FROM THE DAYCARE AT 4:30 P.M. ON MONDAYS AND DROP OFF AT THE DAYCARE ON WEDNESDAY MORNINGS AT 8:30 P.M. UNTIL FURTHER ORDER OF THE COURT.

[H.M.]'S PRELIMINARY OBJECTIONS WITH RESPECT TO THE EMERGENCY CIRCUMSTANCETS ONLY ARE OVERRULED AND ARE OTHERWISE PRESERVED FOR FUTURE HEARINGS.

Order, 3/25/24, at 1.[2]

On March 27, 2024, this case was transferred to the purview of the Honorable Rajinderpal Sandher. *See* Order, 3/27/24, at 1 (unpaginated). Following Judge Sandher's appointment, H.M. sought to further litigate the matter of C.M.D.'s standing. Ultimately, Judge Sandher held that he was bound by Judge Cohen's ruling with respect to H.M.'s preliminary objections pursuant to the rule of coordinate jurisdiction.[3] *See* Order, 7/15/24, at 1 (unpaginated).

Thereafter, the trial court held protracted custody hearings on December 12 and December 19, 2024, and January 3, 2025. In pertinent part, the trial court heard extensive testimony from the parties that largely

_____

[2] On April 8, 2024, H.M. filed an application requesting that the trial court amend its March 25, 2024 order to permit her to file an immediate interlocutory appeal. *See* Application to Amend Order, 4/8/24, at 1-22 (citing 42 Pa.C.S.A.[ § 702(b); Pa.R.A.P. 1311). The same day, H.M. also filed a separate application seeking a stay of the proceedings. The parties each submitted substantial materials in support and opposition to these requests. There is no indication that the trial court ever ruled on these applications.

[3] H.M. has not challenged this aspect of the court's holding on appeal.

pertained to custody issues that are not directly implicated in the instant appeal. On February 18, 2025, the trial court filed an order that awarded the parties shared legal custody of Child. **See** Order (Part 1), 2/18/25, at 3. The order awarded H.M. primary physical custody while granting C.M.D. partial physical custody "every other weekend" and overnight on Wednesdays. **Id.** at 4. The order also set forth a number of additional custody parameters that are not relevant to our resolution of this matter.[4]

On March 12, 2025, H.M. filed a motion for reconsideration requesting clarification and revisions of various aspects of the trial court's custody order that did not relate to C.M.D.'s standing.[5] On March 19, 2025, the trial court filed an order expressly granting H.M.'s request for reconsideration. **See** Order, 3/19/25, at 1 (unpaginated). On March 20, 2025, C.M.D. filed an answer and cross-motion for reconsideration. On March 27, 2025, C.M.D. filed a *praecipe* providing the trial court with a copy of the Supreme Court's holding in **Glover**, which had been issued seven days earlier. **See Glover**, 333 A.3d at 325 (filed on March 20, 2025).

_____

[4] H.M. has not challenged these custody parameters on appeal. Nonetheless, we note that Judge Sandher issued extensive and well-reasoned findings pursuant to 23 Pa.C.S.A. § 5328(a). **See** Order (Part 2), 2/18/25, at 1-10.

[5] On March 12, 2025, H.M. filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) with respect to the trial court's February 18, 2025 order. Following the trial court's grant of reconsideration, however, H.M. filed a *praecipe* seeking to strike the notice of appeal and concise statement of appeal as inoperative. **See** *Praecipe* in Custody Matters, 3/31/25, at 1 (unpaginated).

On August 15, 2025, the trial court filed an order that resolved the outstanding matters raised in the parties' respective requests for reconsideration. *See* Order, 8/15/25, at 1. On September 11, 2025, H.M. timely filed a notice of appeal along with a Rule 1925(a)(2)(i) concise statement. On October 9, 2025, the trial court filed a thoroughly responsive Rule 1925(a) opinion. *See* Trial Court Opinion, 10/9/25, at 1-35.

H.M. has raised the following issues for our consideration:

1. In a custody dispute involving former same-sex partners, did the trial court err as a matter of law in concluding that C.M.D. had standing to assert a custody claim as a parent under an intent-based analysis of 23 Pa.C.S.A. § 5324(1)?

2. In a custody dispute involving former same-sex partners, did the trial court err as a matter of law in concluding that C.M.D. had standing to assert a custody claim as a parent under an estoppel analysis of 23 Pa.C.S.A. § 5324(1)?

3. In a custody dispute involving former same-sex partners, did C.M.D. have standing to assert a custody claim as a parent under a contract-based analysis of 23 Pa.C.S.A. § 5324(1)?

4. In a custody dispute involving former same-sex partners, did C.M.D. have *in loco parentis* standing to assert a custody claim under 23 Pa.C.S.A. § 5324(2)?

H.M.'s Brief at 9-10 (issues reordered for ease of disposition; cleaned up).

Generally, in addressing issues of standing, our standard of review is *de novo* and our scope of review is plenary. *See Hunt v. Vardaro*, 317 A.3d 1046, 1049 (Pa. Super. 2024) (citing *In the Interest of K.N.L.*, 284 A.3d 121, 132-33 (Pa. 2022)). Where our mandate involves reviewing the factual findings and credibility determinations of the trial court, we will accept them

insofar as they are supported by the record. ***See K.N.L.***, 284 A.3d at 132 (cleaned up). In the context of child custody, we are "compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported." ***Id.*** at 133 (cleaned up).

Our Supreme Court has delineated the basic legal considerations relevant to standing disputes in child custody matters, as follows:

> The fundamental concept of standing ensures that a party seeking to litigate a matter has a substantial, direct, and immediate interest in the subject-matter of the litigation. In the area of child custody, principles of standing have been applied with particular scrupulousness[.] This stringent application of standing principles serves to protect both the interest of the court system by ensuring that actions are litigated by appropriate parties and the interest in keeping a family unit free from intrusion by those that are merely strangers, however well-meaning. . . . The liberty interest . . . of parents in the care, custody and control of their children is perhaps the oldest fundamental liberty interest recognized by this Court. Determining standing in custody disputes is a threshold issue that must be resolved before proceeding to the merits of the underlying custody action. It is a conceptually distinct legal question which has no bearing on the central issue within the custody action-who is entitled to physical and legal custody of a child in light of his or her best interests.

***C.G.***, 193 A.3d at 898 (cleaned up).

At the statutory level, the Custody Act ("the Act"), 23 Pa.C.S.A. §§ 5322-40, provides that the "parent" of a child is entitled to seek "any form of physical custody or legal custody." 23 Pa.C.S.A. § 5324(1). There is, however, no statutory definition of who qualifies as a "parent" for these purposes. ***See generally*** 23 Pa.C.S.A. § 5322 ("Definitions"). "'Absent a definition . . ., statutes are presumed to employ words in their popular and

- 11 -

plain everyday sense, and the popular meaning of such words must prevail.'"
*C.G.*, 193 A.3d at 900 (quoting *Centolanza v. Lehigh Valley Dairies, Inc.*,
658 A.2d 336, 340 (Pa. 1995)). Traditionally, Pennsylvania law has
recognized four paths to parentage and seeking custody: (1) biology; (2)
adoption; (3) equity or estoppel; and (4) contract. *See id.* at 906.

Of late, however, our statewide jurisprudence has increasingly
recognized "the reality of the evolving concept of what comprises a family
cannot be overlooked," particularly in "cases that specifically involve the use
of alternative means of conceiving and[/]or reproducing through [ART]." *Id.*
at 900. Indeed, this Court has observed that "changes in social mores and
increased individual freedom have created a wide spectrum of arrangements,
filling the role of the traditional nuclear family." *J.A.L. v. E.P.H.*, 682 A.2d
1314, 1320 (Pa. Super. 1996). Until recently, our Supreme Court had declined
to adopt "the broad proposition that parentage can be established by intent in
situations where a child is born with the aid of [ART]." *C.G.*, 193 A.3d at 905.

These considerations culminated in the issuance of *Glover*, wherein the
Pennsylvania Supreme Court formally endorsed a "fifth pathway to parentage"
in a case involving a "same-sex couple" who conceived a child through the use
of a sperm donor and ART. *Glover*, 333 A.3d at 327. Specifically, our
Supreme Court held that "parentage may be established by proof of intent
shared by two parties to use ART to conceive and co-parent a child together,

even without meeting all the formalities of contract law." *Id.* at 356. *Glover*

declined to establish a bright-line rule or create a new presumption:

> Instead, it is enough to say that courts undertaking an intent-based parentage analysis should consider all evidence from all relevant time periods – including, when applicable, pre-conception, during conception, during gestation, during birth, and post-birth – to determine whether the parties jointly undertook ART intending to conceive and co-parent the child together.

*Id.* at 357.

Instantly, the trial court undertook a meticulous review of the evidence adduced by the parties and concluded, *inter alia*, that *Glover* applied such that C.M.D. should be deemed Child's parent due to the evidence concerning the parties' intent to conceive and co-parent Child together. *See* Trial Court Opinion, 10/9/25, at 17-26. This aspect of the trial court's holding is the subject of H.M.'s first claim for relief, wherein she argues that the trial court misapplied *Glover*. *See* H.M.'s Brief at 47-69. Specifically, H.M. maintains the trial court failed to give appropriate weight to facts that she claims distinguishes this case from the holding in *Glover*. *See id.*

Given the factually intensive nature of our inquiry, a close review of the facts in *Glover* is warranted. That case concerned a married same-sex couple, Chanel Glover and Nicole Junior, who began pursuing conception and mutually entered into a series of contracts with ART-related medical providers between February 2021 and August 2021. *See Glover*, 333 A.3d at 327-28. The parties collaborated in selecting a sperm donor who resembled Junior. *See id.* at 327. Junior also shared in the costs of the ART treatments and

- 13 -

"assisted" Glover with medical procedures. *Id.* Ultimately, the child was conceived in August 2021 utilizing Glover's egg and the donor sperm. *See id.* at 328. The parties in *Glover* executed affidavits indicating their intent to co-parent and Junior attested to her intent to adopt the child. *See id.* The parties also planned a baby shower together, although it was eventually cancelled. *See id.* at 329. The parties' relationship quickly deteriorated, which led to Glover filing a complaint in divorce in April 2022, while still pregnant. *See id.* Junior filed a petition for special relief for pre-birth establishment of parentage and an emergency petition seeking the same relief. *See id.* Ultimately, the family court filed an order granting her relief, which "confirmed" Junior as a legal parent under a contractual theory. *Id.*

Glover appealed. This Court initially reversed but subsequently granted Junior's application for *en banc* review and held that Junior had "established parentage by three alternative means: (1) a contract-based right; (2) equitable estoppel; and (3) intent-based parentage." *Id.* at 335-36 (citing *Glover v. Junior*, 306 A.3d 899, 913-19 (Pa. Super. 2023) (*en banc*)). Our Supreme Court granted allowance of appeal, adopted the theory of intent-based parentage under Pennsylvania law, and affirmed on that basis alone. *See id.* at 357. In holding that Junior was a legal parent based upon the parties' shared intent, the Supreme Court emphasized the following:

> [T]he record here is replete with evidence to support the lower courts' holdings the parties mutually intended to bring [the child] into the world and raise him together, and that Junior participated in that process. Among other things, Glover and Junior jointly

- 14 -

entered into multiple contracts pertaining to the conception and birth of [the child], and Junior was even listed as a "Co-Intended Parent" [on one such contract]. Junior played an active role in selecting the sperm donor, and the couple chose a donor based on his similarities to Junior. Junior shared equally in the costs of conceiving [the child] and assisted Glover with the IVF process by administering injections and attending doctors' appointments. They planned a baby shower together and picked out a name for the baby. But perhaps most cogently, both Glover and Junior signed affidavits stating their intentions plainly.[6]

*Id.*

In pertinent part, H.M.'s arguments highlight several factual differences between the instant circumstances and those in ***Glover***, including: (1) the absence of affidavits attesting to the parties' intent; (2) the fact that H.M. and C.M.D. were not married; (3) C.M.D. did not directly participate in the selection of the sperm donor; (4) C.M.D. did not contribute to the costs associated with the ART treatments; (5) C.M.D. was not identified as a co-parent during H.M.'s initial treatments through UC; (6) H.M. "never agreed" to C.M.D. adopting Child; and (7) the parties' conduct following Child's birth indicates a lack of shared intent. ***See*** H.M.'s Brief at 53-67.

In its Rule 1925(a) opinion, the trial court acknowledged that there are some factual distinctions between this case and ***Glover***. ***See*** Trial Court Opinion, 10/9/25, at 25-26. Nonetheless, the court concluded that "the facts weighing against intent are not only overcome, but overwhelmed, by the facts

---

[6] As discussed further *infra*, however, our Supreme Court clarified that its holding in ***Glover*** did not "require" couples in "similar circumstances to document their intentions in writing." ***Glover***, 333 A.3d at 357.

- 15 -

indicating intent to co-parent" in this case. *Id.* The court detailed its findings, with extensive and accurate citations to the certified record, as follows:

### 1. Legal Rights Over the Embryos

[I]t is important to see the evolution of H.M.'s and C.M.D.'s relationship during H.M.'s "fertilization journey." H.M. first began her "fertilization journey" by herself by purchasing sperm without telling C.M.D. around the time of their first break-up. N.T., 1/3/25, at 129. If that were when she had become impregnated, it would be clear she had no intent for C.M.D. to be the other parent. But H.M. did nothing with the sperm until after C.M.D. and H.M. got back together and began living together.

After their reconciliation, H.M. went through an egg retrieval procedure. She then used the sperm to create fertilized embryos. C.M.D. testified (and H.M. never contradicted her testimony) that H.M. first offered to return the sperm and allow C.M.D. to be involved in the selection of the sperm donor but C.M.D. was content with the sperm donor H.M. had previously chosen. *See* N.T., 12/19/24, at 219-20. The fertilization resulted in two viable embryos, which were kept frozen at [UC]. H.M. alone had legal control over the embryos and H.M.'s sister was named the beneficiary of the embryos in the event of H.M.'s death. *See* N.T., 1/3/25, at 136-37.

H.M. then attempted to get pregnant via IUI, not IVF, instead saving her viable embryos for a potential future child. At this time, C.M.D. was heavily involved in planning to have a child and in accompanying H.M. to appointments. [*See* N.T., 12/19/24, at 28, 217.] C.M.D. and H.M. were also looking for a home to purchase together in Philadelphia. [*See* N.T., 12/12/24, at 172; N.T., 3/25/24, at 31-32.] However, H.M.'s name, alone, was on all of the fertilization paperwork at [UC]. *See* N.T., 1/3/25, at 135-36. H.M. did successfully become pregnant via IUI and she celebrated with C.M.D. and C.M.D. even informed her family that they were expecting a child. . . . However, this pregnancy resulted in a miscarriage[,] and the parties buried the remains together. [*See* N.T., 12/12/24, at 176.]

After the parties moved to Philadelphia, though, H.M. transferred her frozen embryos from [UC] to [Main Line Fertility]. Importantly, upon doing so, H.M. changed the legal status of the

embryos. They were no longer under her control alone but under both C.M.D.'s and H.M.'s legal control. *See* N.T., 1/3/25, at 294-98; N.T., 12/12/24, at 194-95; Exhibit P-12. And in the event of either's death, the embryos would pass to the other. *See* N.T., 12/12/24, at 188-89; Exhibit P-11. Only in the event of the parties' simultaneous death would the embryos pass to H.M.'s sister. *See* N.T., 12/12/24, at 189.

This change of legal control over the embryos is a clear manifestation of intent that the embryos and any potential children would be the children of both C.M.D. and H.M. And, in fact, when the second embryo was thawed and implanted into H.M. before becoming Child, both H.M. and C.M.D. had to consent to that procedure. *See* N.T., 1/3/25, at 294-98; N.T., 12/12/24, at 194-95; Exhibit P-12. This [c]ourt found it highly improbable that H.M. would cede such ownership and control over her embryos to C.M.D., especially requiring C.M.D.'s consent to implant an embryo into H.M., unless she intended C.M.D. to be her co-parent.

### 2. Implantation of an Embryo into C.M.D.

Before the embryo that became Child was implanted into H.M., the other of the two viable embryos was implanted into C.M.D. *See* N.T., 1/3/25, at 142; N.T., 12/12/24, at 192. H.M. argues that C.M.D. was merely her girlfriend, or a trusted support person, not a co-parent. *See* N.T., 3/25/24, at 140-41. And she tried to explain away the implantation of one of her two viable embryos into C.M.D. as a decision that she succumbed to because of C.M.D.'s nagging. *See* N.T., 1/3/25, at 142-43. H.M. further testified that she thought of this action as giving away an embryo and that she never would have considered the resulting child (had there been one) to be her child. *See id.* at 143.

This [c]ourt found it incredibly unlikely that someone would give up an embryo she had worked so hard for and when she had so few due to mere nagging. This unlikelihood is exacerbated by the fact that H.M. repeatedly testified as to her desire to have full biological siblings. *See id.* at 132, 137. Given the failure of IUI to this point, these two embryos were potentially the only opportunities to create H.M.'s own biological children. . . . This [c]ourt did not find H.M.'s testimony credible on this matter.

### 3. C.M.D. Breastfed Child

Early in H.M.'s pregnancy with Child, C.M.D. began a lengthy process to induce her own lactation due to the biological difficulty of doing so without becoming pregnant. *See* N.T., 12/12/24, at 202-03. C.M.D. scheduled consultations with a lactation specialist and H.M. accompanied her to at least one of these consultations. *See* N.T., 1/3/25, at 305. C.M.D. took various hormones for months to induce lactation and when she eventually produced colostrum, H.M. photographed the occasion and thanked C.M.D. for all she was doing. *See id.* at 307. H.M. testified that she never expressed any reservations to C.M.D. about C.M.D.'s clear intent to breastfeed Child. *See id.* at 162, 428. And Child first drank C.M.D.'s breastmilk in the birthing suite immediately after the birth. And C.M.D. continued to breastfeed for the first six months of Child's life, albeit in a limited capacity because H.M. had ample breastmilk and it would cause H.M. pain if Child did not drink it. *See* N.T., 1/3/25, at 162-63; N.T., 3/25/24, at 59. H.M. testified that she in no way endorsed or encouraged C.M.D. to breastfeed and that H.M. was simply doing her own thing while C.M.D. did hers. *See* N.T., 1/3/25, at 161-62.

This court, again, found this testimony not credible. H.M. had countless opportunities to address the matter and it is not typical for mere friends and support people (non-parents) to breastfeed other's children, let alone to put months of preparation into being able to do so. And this court found it highly unlikely that H.M. would not say anything while watching C.M.D. put in this sort of effort to prepare to breastfeed H.M.'s child unless it was also intended to be C.M.D.'s child.

### 4.  H.M. Referred to C.M.D. as Child's Mother

H.M. explicitly called C.M.D. Child's mother on multiple occasions, both to C.M.D., herself, and to strangers. On C.M.D.'s birthday, seventeen days after Child was born, H.M. gave C.M.D. a birthday cared which included the statements: "baby girl has joined us," "what an incredible time of parenting, of growing as a family," "here's to your first birthday with [Child]," "you're an incredible mom," and "looking forward to our journeys together as a family." Exhibit P-36. [I]t also contained an outline of Child's hand surrounded by the words: "a new precious hand to hold and to love and to care for." *Id.* H.M. also sent C.M.D. a text message of a bitmoji with a white woman and a black woman holding a baby (clearly representing C.M.D., H.M., and Child, respectively)

- 18 -

and the words: "I love that we started a family together." Exhibit P-38. H.M. even publicly referred to both C.M.D. and H.M. as Child's parents to strangers. ***See*** N.T., 1/3/25, at 442-43.

H.M. emphasized "the many years" over which these presumably few instances of H.M. calling C.M.D. Child's mother occurred. ***See id.*** at 442. But this court noted that it was significant that it would have happened multiple times at all given H.M. and C.M.D. began breaking up just five months after Child's birth and were fully separated within a year of Child's birth. Any references to C.M.D. as Child's mother by H.M. are also especially significant given H.M.'s tendency toward privacy. The parties were in a romantic relationship for about seven years, C.M.D. travelled with H.M. to the United Kingdom for H.M.'s family to meet Child, and yet H.M. was still in the closet to her sister, with whom she spoke "every day," the rest of her family, and her best friend[,] until this litigation caused her sexuality to be revealed. ***Id.*** at 20, 32-33, 45, 90.

H.M. also argued that she felt that terms like "mother" and "family" were relatively loose terms within C.M.D.'s family and that her intent was really to call C.M.D. a valued member of her and Child's community . . . . ***Id.*** at 448. This court did not find H.M.'s testimony to this effect credible. H.M. put forward no examples of anyone else to whom she ever said anything vaguely similar that could be misinterpreted as calling them Child's parents. Furthermore, while H.M. repeatedly testified confidently about her specific thoughts and intent for actions from years before . . ., her memory consistently became conveniently hazy and it became "hard to recall exactly" details as to why she repeatedly referred to herself, C.M.D., and Child as a family or how C.M.D. behaved as a parent. ***See id.*** at 294, 307, 309, 316-17, 321, 334, 352, 393, 398, 447-48.

### 5.    Two of Child's Four Names Came from C.M.D.'s Family

H.M. and C.M.D. collaborated on choosing a name for Child, as this court recognized that parents often do. However, H.M. also collaborated with her sister on choosing a name for Child. It was unsurprising to this court, given that H.M. had not revealed her relationship with C.M.D. to her sister, that these conversations were separate and that H.M.'s sister was not aware of C.M.D.'s involvement in picking Child's name. ***Id.*** at 48. But H.M. was

clear about what qualities she desired in a name for Child. She wanted names that related to her black and Islamic heritage but that were sufficiently simple or common across multiple heritages that Child would likely not have to repeatedly spell or correct the spelling and pronunciation of her name. *See id.* at 154-55. Ultimately, Child was given four names: a first name, a middle name, and two last names which were hyphenated. Child's first name and one of her last names met the criteria H.M. desired for Child's name. The middle name and especially the other last name, . . . very much did not. *See id.* at 158. And yet, those names were given to Child[,] and they came from C.M.D.'s family.

While it is plausible that someone would name their child after a mere friend, especially a middle name, this court recognized that passing on of last names is typically a specifically parental action. The fact that the [last name from C.M.D.'s family] is so antithetical to H.M.'s preferences (simplicity and recognizability) otherwise bolsters the notion that Child was given the name . . . as a symbol of C.M.D.'s parentage. This court considered why Child then did not receive C.M.D.'s own last name, but this court observed that H.M.'s family met C.M.D. but did not know about the parties' relationship. H.M. told her family that [Child's last name drawn from C.M.D.'s family] was "random." *Id.* at 66. Had the name been C.M.D.'s own last name, that would likely have prompted additional questions.

### 6.    Other Facts Relevant to Intent

This court deemed that any of the five facts above would be incredibly unusual in a non-parental relationship. . . . With all five combined, the evidence of H.M.'s intent to co-parent is overwhelming. While H.M. tried to explain away her behavior at trial, the explanations fell flat and were simply not credible. In arguing that C.M.D. was merely her girlfriend, or a trusted support person, not a co-parent, H.M. sounded to this court like someone who had chosen to have a child with C.M.D. and then changed her mind and was desperately trying to convince everyone, herself included, that it had never been her intent to begin with.

However, the facts above are merely the strongest points in favor of finding intent. There are many smaller details in the record that also suggest that C.M.D. and H.M. were co-parents. They purchased a home together (including a letter in their bid talking about their desire to raise a family together there). *See*

N.T., 12/12/24, at 165; N.T., 3/18/24, at 47; Exhibit P-10. While pregnant, H.M. gave C.M.D. a Valentine's Day card on which she wrote "our little family grows in love and number," although she testified that she did not recall what she meant by those words (this court did not find that testimony credible). *See* N.T., 1/3/25, at 317. C.M.D. researched medical providers and accompanied H.M. on medical visits to the extent possible during the COVID pandemic. *See* N.T., 12/12/24, at 196-97. When she could not go inside with H.M., she was on video calls with H.M. for the appointments, including having healthcare providers hold up the phone to the ultrasound so C.M.D. could listen to Child's heartbeat. *See id.* at 197. C.M.D. and H.M. attended a baby shower explicitly thrown for both of them as parents and H.M. never stated to C.M.D., or anyone else, that C.M.D. was not a parent. *See* N.T., 1/3/25, at 304.

C.M.D. was present . . . at Child's birth, caught Child, cut the umbilical cord, and had skin-to-skin time with Child, all traditional parental behaviors. *See* N.T., 1/3/25, at 305; N.T., 12/12/24, at 206-08. C.M.D. took Child alone to a pediatric appointment while H.M. was recovering from labor and managed food for the family and other household responsibilities during that time. *See* N.T., 1/3/25, at 167, 320-21, 397-400; N.T., 12/12/24, at 207-10. C.M.D. sent out a birth announcement that explicitly stated that H.M. and C.M.D. were both parents of Child and H.M. never objected to that characterization either to C.M.D. or anyone else. *See* N.T., 1/3/25, at 396. H.M. arranged for C.M.D. and H.M. to take what looked to this court very much like traditional family photos with Child. *See* N.T., 1/3/25, at 443-45; Exhibit P-14. . . . The parties jointly made decisions about pediatricians and daycares. *See* N.T., 1/3/25, at 176, 308; N.T., 12/12/24, at 197.

C.M.D. accompanied H.M. on a visit to H.M.'s family with Child (although she didn't reveal the nature of their relationship because H.M. was still in the closet to her family at that time). *See* N.T., 1/3/25, at 32-33. H.M.'s sister testified that C.M.D. acted strangely possessive of Child during this visit ("[L]ike, overly affectionate with her, giving her lots of hugs and kisses and things like that."). *Id.* at 34. This court considered that such behavior would seem odd given her assumption that H.M. was a single parent, but that it would seem very normal if C.M.D. were a parent to Child.

> H.M. heard C.M.D. refer to herself as Child's parent and received cards and a family heirloom from C.M.D.'s family that explicitly indicated C.M.D.'s belief and C.M.D.'s family's belief that C.M.D. was Child's parent. *See* Exhibits P-1, P-2, P-3, P-4, P-5, and P-16. H.M. did not object to the characterization or correct them. *See* N.T., 1/3/25, at 396; N.T., 3/18/24, at 31-32. This court considered it unlikely that someone who intended to be a single parent would not have a clarifying conversation with a romantic partner who is very clearly demonstrating that she believes she will be a co-parent.

Trial Court Opinion, 10/9/25, at 19-25 (emphasis added; cleaned up).

We have comprehensively reviewed the extensive certified record in this case. Based upon that review, we readily conclude that the trial court's factual findings and credibility determinations are fully supported by the evidence, as evinced by the above-quoted discussion and citations. We recognize that the respective testimonies and evidence proffered by H.M. and C.M.D. were in conflict regarding many of the findings rendered by the trial court in this case. We emphasize, however, that "with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand." *D.K. v. S.P.K.*, 102 A.3d 467, 478 (Pa. Super. 2014). Indeed, our Supreme Court has deferred to the well-supported "credibility determinations" of the trial court when "faced with conflicting testimony" in matters concerning a party's standing to seek child custody. *C.G.*, 193 A.3d at 910; *see also K.N.L.*, 284 A.3d at 132-33 (same).

Moreover, in her desire to determinably pursue this appeal, many of H.M.'s arguments challenging the trial court's findings regarding intent largely misrepresent the evidence of record and/or misapprehend the gravamen of

the holding in *Glover*. For example, H.M. has highlighted the absence of affidavits attesting to the parties' intent with respect to Child. *See* H.M.'s Brief at 62. We emphasize, however, that *Glover* explicitly declined to impose a requirement that such evidence is strictly necessary:

> Despite our acceptance of intent-based parentage in the ART context, we nevertheless encourage couples in similar circumstances to document their intentions in writing. While not necessarily dispositive, such writings (like the affidavits in this case) provide strong evidence of intent should a dispute arise, even if the writings do not meet the elements of a contract. We do not foreclose the possibility that partners in a couple **could** contract with each other to have a child together. **But the point is that we do not require them to do so, and in any event, under this intent-based doctrine, the additional elements required by contract law need not be proved.**

*Glover*, 333 A.3d at 357 (some emphasis added). As detailed in the trial court's factual findings above, there is ample evidence speaking to the parties' intent irrespective of the absence of affidavits like those in *Glover*.

H.M. has also alleged that the instant case is distinguishable from *Glover* since she and C.M.D. were never married. *See* H.M.'s Brief at 62. We emphasize, however, that the marriage in *Glover* had broken down such that Junior was unable to benefit from marital presumptions for paternity purposes. *See Glover*, 333 A.3d at 349. Indeed, this was one of the Supreme Court's primary motivations for its adoption of intent-based parentage, *i.e.*, to address factual circumstances not already covered by Pennsylvania's existing legal framework. *See id.* Moreover, the holding in *Glover* intentionally declined

to directly tie the concept of intent-based parentage to marriage by announcing "a new marital presumption," reasoning as follows:

> Certainly, the fact a couple is married at the time they decide to conceive a child will typically weigh in favor of finding they intended to conceive and raise the child together. And we do not foreclose the possibility that as our common law develops pursuant to this doctrine, intent in those situations may be deemed so prevalent as to warrant the adoption of a presumption. **But we need not make that pronouncement today, where the record contains extensive evidence of the parties' intent. Instead, it is enough to say that courts undertaking an intent-based parentage analysis should consider all evidence from all relevant time periods[.]**

*Glover*, 333 A.3d at 357 (emphasis added).

Contrary to H.M.'s arguments, *Glover* did not attach outsized significance to the existence of a marriage in recognizing intent-based parentage under Pennsylvania law. Instead, *Glover* directed courts considering intent-based parentage arguments to view "all evidence" concerning the controversy, as the trial court clearly did in this case. *Id.* Moreover, this line of argument largely ignores that the parties were in a romantic relationship for seven years, wherein they purchased real property together and jointly underwent ART procedures that led to the conception and birth of Child. While not a legal marriage or formalized partnership, this relationship certainly bears all of the hallmarks of mutual commitment. *See*, *e.g.*, *id.* at 353 n.27 ("[B]iology and marriage are not the only indicia of family formation that are worth of judicial recognition . . . and our statutes should

- 24 -

be construed to bring the recognized framework of our domestic relations law to families as we find them.") (cleaned up).

We also cannot credit H.M.'s contention that C.M.D. did not participate in the selection of a sperm donor in this case. *See* H.M.'s Brief at 63. As noted above, C.M.D.'s unchallenged testimony on this issue indicated that H.M. requested C.M.D.'s approval of the donor that she had selected and offered to select a different donor with C.M.D.'s input. *See* N.T., 12/19/24, at 219. C.M.D. approved of H.M.'s selection of a sperm donor and the couple moved forward with ART procedures based upon that approval. *See id.* As such, H.M.'s argument that C.M.D. did not participate in the selection of the sperm donor that led to Child's birth simply lacks merit.

Furthermore, the record concomitantly indicates that C.M.D. played a more direct and substantial role in the parties' efforts to conceive a child than the petitioner in *Glover* by being implanted with one of H.M.'s two viable embryos. *Compare* N.T., 1/3/25, at 142; N.T., 12/12/24, at 192 *with Glover*, 333 A.3d at 327-28 (indicating that Junior had supported Glover in their efforts to conceive by administering "various hormone injections" and attending "obstetrics appointments"). Moreover, C.M.D. also supported H.M. in very similar ways to the petitioner in *Glover* by attending appointments with H.M. while she was pregnant, researching medical providers, and administering shots of progesterone to H.M. *See* N.T., 12/12/24, at 196-98.

To the extent that H.M. has sought to minimize C.M.D.'s participation in the ART procedures, the certified record belies her claims.

H.M. has also sought to distinguish this case from **Glover** based upon C.M.D.'s failure to contribute to the financial costs of the ART procedures that led to Child's conception. **See** H.M.'s Brief at 63, 65. We are mindful, however, that **Glover** cautioned Pennsylvania courts to avoid placing too much emphasis on financial considerations in this particular context, lest the determination of paternity devolve into a mere transactional inquiry:

> [W]hile couples who have a child together generally share the financial and emotional burdens, they do not do so as a **bargained-for exchange** for parentage and parental rights. A couple's decision to have a baby together is often profoundly intimate and may not be so easily reduced to a transaction.

**Glover**, 333 A.3d at 342 (emphasis in original). Here, the record indicates that C.M.D.'s lack of financial contributions was largely motivated by the fact that H.M. was better financially situated to pay for the costs associated with the ART procedures. **See** N.T., 12/19/24, at 16; N.T., 3/25/24, at 53-54.

Additionally, **Glover** noted that couples undergoing ART also expend significant "emotional" and "physical" resources during the process, in addition to financial costs. **Glover**, 333 A.3d at 349. As set forth above, the certified record indicates that C.M.D. invested significant physical resources in the ART process that led to Child's conception by undergoing implantation and hormone therapy to permit her to breastfeed Child. **See** N.T., 1/3/25, at 142; N.T., 12/12/24, at 192, 202-03. Furthermore, C.M.D. also expended

emotional resources by consistently supporting H.M. during her second implantation and the resulting pregnancy. *See* N.T., 12/12/24, at 196-98. Based upon this evidence, we find no merit in H.M.'s contention that C.M.D. did not sufficiently contribute to the ART process that led to Child's conception.

H.M.'s arguments also emphasize that C.M.D. was not listed as a co-parent or granted legal rights to H.M.'s embryos through UC. *See* H.M.'s Brief at 64-65. This argument, however, flatly ignores the undisputed testimony and evidence of record demonstrating that H.M. subsequently granted C.M.D. extensive legal rights when the couple began pursuing ART procedures through Main Line Fertility. *See* Exhibit P-11. Consequently, C.M.D.'s consent was necessary in order for H.M. to undergo the implantation procedure that, ultimately, led to Child's conception and birth. *See* N.T., 1/3/25, at 294-98; N.T., 12/12/24, at 194-95; Exhibit P-12. Contrary to H.M.'s arguments, the record indicates that C.M.D. was listed as a "patient" or "partner" on the Main Line Fertility paperwork and granted legal rights to the at-issue embryos. When viewed in the appropriate light of the entire factual record, H.M.'s limited focus upon the UC paperwork is unavailing.

H.M. has also argued that she refused to permit C.M.D. to formally adopt Child. *See* H.M.'s Brief at 66 ("[H.M.] never agreed to an adoption."). Relatedly, she also emphasizes that C.M.D. was not listed on Child's birth certificate. *See id.* Respectfully, we find that H.M. has somewhat misrepresented the evidence on this particular point. Specifically, the

evidence credited by the trial court indicates that C.M.D. was not listed on Child's birth certificate due to the parties' mutual concerns about the legality of having this done. *See* N.T., 1/3/25, at 393; N.T., 12/19/24, at 220-21. Furthermore, H.M. testified that the parties considered and pursued the prospect of adoption by meeting with an attorney who specialized in "second parent adoption." N.T., 1/3/25, at 153. H.M. then explained that C.M.D. indicated that she "would like to go ahead with the second parent adoption," to which H.M. gave no response. *Id.* at 153-54. We view this evidence as indicating that C.M.D. desired to adopt Child in line with the parties' expectations prior to and immediately following birth, but that H.M.'s sudden change of heart prevented that process from occurring. While H.M. may have never "agreed" to an adoption, that lone fact does not diminish the other evidence replete through the certified record speaking to the parties' earlier intent.

Finally, H.M. also argues that the parties' conduct following Child's birth indicates that there was no shared intent to conceive and co-parent. *See* H.M.'s Brief at 53-60. We note that since the holding in *Glover* related to establishing pre-birth parentage, the importance of post-birth events was not directly addressed in that holding. *See Glover*, 333 A.3d at 329. Nonetheless, our Supreme Court has noted that post-birth events are relevant to an inquiry regarding intent-based parentage. *See id.* at 357. Overall, H.M.

emphasizes that she was the party responsible for Child's care following the breakdown of her relationship with C.M.D. *See id.*

While H.M. may have been largely responsible for Child's day-to-day care once she recovered from giving birth, we also note that this was the same period of time during which the parties' relationship swiftly and irretrievably broke down. *See* N.T., 12/12/24, at 161; N.T., 3/18/24, at 111, 68. Even during this period, the record indicates that C.M.D. continued to see Child on a near-daily basis, contributed to Child's care by picking her up from daycare, and spent Thursday evenings with Child. *See* N.T., 1/3/25, at 114, 177; N.T., 12/19/24, at 224; N.T., 12/12/24, at 159, 226-27.

We, again, find that H.M.'s arguments fail to account for the entirety of the factual record. Our review indicates that the totality of the events that occurred after Child's birth are strongly indicative of the parties' shared intent with respect to parentage. As detailed above, C.M.D. caught Child while she was being born, cut the umbilical cord, and enjoyed skin-to-skin contact with Child. *See* N.T., 1/3/25, at 305; N.T., 12/12/24, at 206. The parties also collaborated on choosing Child's name immediately following her birth, which explicitly incorporated equal aspects of H.M.'s and C.M.D.'s respective families and concerns. *See* N.T., 1/3/25, at 47-48, 152-57; N.T., 12/12/24, at 213-15. C.M.D. breastfed Child immediately following her birth and continued to do so for the first six months of Child's life. *See* N.T., 1/3/25, at 307-08; N.T., 12/12/24, at 220-22, 208. During this time period, the parties also

expressed their shared parentage of Child in writing, with C.M.D. sending out a birth announcement referring to the parties as parents and H.M. sending a birthday card to C.M.D. referring to C.M.D. as a parent and discussing "our daughter." *See* N.T., 1/3/25, at 396; Exhibits P-16 and P-36. The parties also collaborated on selecting a daycare for Child and, ultimately, chose a facility that C.M.D. had suggested. *See* N.T., 1/3/25, at 175; N.T., 12/12/24, at 274. The record also reflects that C.M.D. attempted to financially contribute to the expenses related to the daycare, although H.M. elected not to use those funds. *See* N.T., 12/19/24, at 43-44.

Based upon the foregoing evidentiary discussion, we find that the trial court's findings of fact and credibility determinations are fully supported by the evidence of record. As the trial court indicated, there are factual distinctions between the instant controversy and those in *Glover*. As explained in our analysis above, however, we do not believe that the Supreme Court intended to create such a narrow rule in *Glover* that parentage by intent is only available to those litigants whose circumstances perfectly mirror the unique facts presented in that particular case. Instead, we read *Glover* as creating a more generally applicable standard requiring that the record in such a case must contain sufficient evidence demonstrating that "the parties mutually intended to bring Child into the world and raise [her] together[.]" *Glover*, 333 A.3d at 357. Furthermore, the party seeking to establish parentage by intent must have "participated in that process." *Id.* As set forth

at length above, we readily conclude that the record in this case fully satisfies these requirements. Thus, we affirm the trial court's holding that C.M.D. has standing to seek custody based upon parentage by intent.

Based upon our resolution of this issue, we need not address the remaining arguments raised by H.M.

Order affirmed.

Judgment Entered.



Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/18/2026